[No. 49617–0. En Banc. November 6, 1984.]

KENNETH P. SHORT, ET AL, *Respondents,* v. CHRIS
DEMOPOLIS, *Petitioner.*

*William R. Bishin* and *Christopher L. Otorowski,* for petitioner.

*Lane, Powell, Moss & Miller,* by *John R. Tomlinson, Timothy F. Brown,* and *Thomas C. Sorenson,* for respondents.

*James E. Sedney* and *Nicholas Wagner* on behalf of National Lawyers Guild, National Conference of Black Lawyers, and La Raza Lawyers Association and *Kenneth O. Eikenberry, Attorney General, John R. Ellis, Deputy, Jon P. Ferguson* and *Betsy R. Hollingsworth, Assistants,* amici curiae for petitioner.

*Robert R. Redman, Robert T. Farrell,* and *Hugh F. Bangasser* on behalf of Washington State Bar Association, amici curiae for respondents.

DOLLIVER, J.—May lawyers be subject to liability under the Consumer Protection Act (CPA), RCW 19.86? Defendant Chris Demopolis appeals the Superior Court order which dismissed his counterclaims under CR 12(b)(6) for CPA violations against the plaintiffs' law firm of Short and Cressman.

In March 1980, Demopolis met with Douglas Hartwich, partner in plaintiffs' law firm, to discuss representation in two pending lawsuits. The first involved dissolution of a real estate partnership. The complaint alleged damages in excess of $200,000. After 2 days of trial, the action settled for $7,500. Attorney fees totaled $19,958.53. The second case involved a real estate forfeiture action. Defendant prevailed and was entitled to immediate possession of the premises, rental delinquencies, and damages.

A dispute ensued over the rendering of legal services. Defendant contends he hired Hartwich to handle personally his legal matters but that without his consent or knowledge Hartwich had a younger partner (Ferrell) and an associate

(Mayotte) do the legal work. Plaintiffs maintain Hartwich personally introduced Ferrell and Mayotte to Demopolis, that he told Demopolis they would be handling the cases, and that Demopolis agreed to this arrangement.

The parties also contest the payment of attorney fees. Defendant asserts he rejected plaintiffs' first bill and made a final settlement of $14,000. The second bill for $29,122.80 is considered excessive by defendant as he holds numerous grievances with the quality of representation. Plaintiffs state they attempted to obtain payment from Demopolis but were unsuccessful. Subsequent to filing a notice of intent to withdraw in August 1980, but before the effective date, plaintiffs maintain they entered into an agreement with Demopolis.

In a letter dated September 3, 1980, Hartwich wrote Demopolis confirming (1) plaintiffs' acceptance of $14,000 as full payment for the partnership matter; (2) withdrawal of their notice to withdraw; (3) plaintiffs' intent to bill at their regular hourly rates for time expended on the second case; and (4) noting "You will be working on the [second] case directly with Don Ferrell and Jim Mayotte, as was the case in the partnership action." A handwritten statement, signed by Demopolis, to hold Short and Cressman harmless for the release of trust funds totaling $3,025.35 held by them for Demopolis' former attorney is on the first page of this letter. However, Demopolis' affidavit states he never received the original or a copy of the letter; he only agreed to hold plaintiffs harmless for the release of trust funds, and was not told he was waiving any legal rights to complain about the fees or the handling of the first case.

Plaintiffs sued Demopolis for breach of an express contract to pay for legal services. Demopolis denied liability and asserted affirmative defenses and counterclaims. He alleged 10 causes of action: (1) unfair and deceptive practices in violation of the Consumer Protection Act, RCW 19.86; (2) breach of contract; (3) violation of Code of Professional Responsibility DR 2–106 (excessive fees); (4) violation of CPR DR 6–101 (incompetence); (5) negligence and

malpractice; (6) fiduciary duty violations; (7) misrepresentation; (8) violation of CPR DR 2–110 (threat to withdraw) causing mental distress; (9) reformation of contract; and (10) attorney fees assessment.

Plaintiffs moved for summary judgment which was denied, except for defendant's claim for emotional distress damages which was dismissed. Subsequently, and before a second judge, plaintiffs made a CR 12(b)(6) motion to dismiss defendant's 1st, 3rd, 4th, 8th, and 10th causes of action. This latter motion was granted and the counterclaims were dismissed with prejudice. Three reasons were cited for dismissing defendant's counterclaims for CPA violations. First, the practice of law did not constitute the conduct of any trade or commerce within the meaning of the CPA or Washington case law. Second, to regulate the legal profession through the CPA was an unconstitutional infringement on the power of the judiciary to regulate the practice of law. Third, other adequate remedies (breach of contract and malpractice) were available.

Defendant was granted direct discretionary review and assigns error to the dismissal of his CPA violation counterclaims pursuant to CR 12(b)(6) ("failure to state a claim upon which relief can be granted").

I

The first issue we consider is whether the practice of law falls within "trade or commerce" as that term is defined by RCW 19.86. RCW 19.86.020 provides:

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

"'Trade' and 'commerce' shall include the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington." RCW 19.86.010(2).

The trial court, relying on *Lightfoot v. MacDonald,* 86 Wn.2d 331, 544 P.2d 88 (1976), interpreted the CPA as exempting the practice of law. In *Lightfoot,* a client allegedly suffered damages as a result of her attorney's nonfea-

sance. We disallowed her CPA claim because of her failure to show sufficient public impact. 86 Wn.2d at 338–39.

> A breach of a private contract affecting no one but the parties to the contract, whether that breach be negligent or intentional, is not an act or practice affecting the public interest.

86 Wn.2d at 334. In dictum we "implicitly recognized the lack of precedent for the concept that the legal profession is involved in trade and commerce . . ." 86 Wn.2d at 338. Subsequent case law does not appear finally to have answered the question. *See Anhold v. Daniels,* 94 Wn.2d 40, 47–48, 614 P.2d 184 (1980) (Rosellini, J., concurring) ("[w]hether the lawyer [MacDonald] who was sued in that action was engaged in 'trade or commerce' was a question which we left unanswered"); *Salois v. Mutual of Omaha Ins. Co.,* 90 Wn.2d 355, 361, 581 P.2d 1349 (1978) ("*Lightfoot* is correct on its facts in that there was a failure to show that the private dispute affected the public interest or was within the sphere of trade or commerce . . ."); *Bowers v. Transamerica Title Ins. Co.,* 100 Wn.2d 581, 591–92, 675 P.2d 193 (1983) (unauthorized practice of law by employees of an escrow agent is a violation of the CPA).

The CPA contains no language expressly including or excluding attorneys from its purview. The act, however, contains its own guide to statutory construction. RCW 19.86.920 provides:

> The legislature hereby declares that the purpose of this act is to complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive, and fraudulent acts or practices in order to protect the public and foster fair and honest competition. *It is the intent of the legislature that, in construing this act, the courts be guided by final decisions of the federal courts . . .* interpreting the various federal statutes dealing with the same or similar matters and that in deciding whether conduct restrains or monopolizes trade or commerce . . . To this end this act shall be liberally construed that its beneficial purposes may be served.

(Italics ours.)

Some earlier cases from the United States Supreme Court seem by dictum to have recognized a "learned professions" exemption to the antitrust laws. This exemption was based on judicial interpretations of what constituted a trade—"[w]herever any occupation, employment, or business is carried on for the purpose of profit, or gain, or a livelihood, not in the liberal arts or in the learned professions . . ." *Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 436, 76 L. Ed. 1204, 52 S. Ct. 607 (1932). *See* Annot., *"Learned Profession" Exemption in Federal Antitrust Laws (15 U.S.C. §§ 1 et seq.),* 39 A.L.R. Fed. 774 (1978). The question as to whether there could be restraint of "trade or commerce" when the activities restrained were the professional activities of members of a "learned profession" was not reached until *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 44 L. Ed. 2d 572, 95 S. Ct. 2004 (1975).

In *Goldfarb,* the United States Supreme Court held minimum fee schedules, published by a county bar association and enforced by the state bar, violated the Sherman Act, 15 U.S.C. § 1 (1976). The bar association argued immunity under the Sherman Act because the practice of law was a learned profession—not trade or commerce. The association maintained competition was inconsistent with the practice of a profession because enhancing profit was not the goal of professional activities; the goal was to provide community services. 421 U.S. at 786. The Court said neither the nature of an occupation in and of itself nor the claim of public service controlled in determining whether section 1 included performance. The Court went on to state:

> The language of § 1 of the Sherman Act, of course, contains no exception. . . . And our cases have repeatedly established that there is a heavy presumption against implicit exemptions . . . Indeed, our cases have specifically included the sale of services within § 1. . . . Whatever else it may be, . . . the exchange of such a service for money is "commerce" in the most common usage of that word. It is no disparagement of the practice of law as a profession to acknowledge that it has this

business aspect . . . In the modern world it cannot be denied that the activities of lawyers play an important part in commercial intercourse, and that anticompetitive activities by lawyers may exert a restraint on commerce.

(Footnote omitted.) 421 U.S. at 787–88. (*Cf.*, however, footnote 17, where the *Goldfarb* Court acknowledged "[i]t would be unrealistic to view the practice of professions as interchangeable with other business activities . . ." 421 U.S. at 788 n.17.) *See Bates v. State Bar of Ariz.*, 433 U.S. 350, 371–72, 53 L. Ed. 2d 810, 97 S. Ct. 2691 (1977) ("the belief that lawyers are somehow 'above' trade has become an anachronism . . .").

Federal courts generally have refused to adopt a blanket immunity for the "learned professions".

The issue of whether a profession is a learned one is not seen by the Court as the appropriate approach for resolving the higher question of whether the Sherman Act is applicable to that profession. To engage in such an inquiry would chart the Court on a semantic adventure of questionable value. It would be a dangerous form of elitism, indeed, to dole out exemptions to our antitrust laws merely on the basis of the educational level needed to practice a given profession, or for that matter, the impact which the profession has on society's health and welfare. Clearly, the more appropriate and fairer course is to examine the nature and conduct involved in the profession on a case by case basis together with the context in which it is practiced.

*United States v. National Soc'y of Professional Eng'rs*, 389 F. Supp. 1193, 1198 (D.D.C. 1974). *See, e.g., Arizona v. Maricopa Cy. Med. Soc'y*, 457 U.S. 332, 73 L. Ed. 2d 48, 102 S. Ct. 2466 (1982) (fact that doctors, rather than non-professionals, were parties to price fixing agreement did not exempt them from Sherman Act); *National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 55 L. Ed. 2d 637, 98 S. Ct. 1355 (1978) (difference between professional and other business services does not create a broad exemption under the Rule of Reason for learned professions); *Northern Cal. Pharmaceutical Ass'n v. United States*, 306 F.2d 379 (9th Cir.), *cert. denied*, 371 U.S. 862

(1962) (pharmacists had no defense to price fixing on ground it was done by professionals); *Mardirosian v. American Inst. of Architects,* 474 F. Supp. 628 (D.D.C. 1979) (architects subject to antitrust laws); *United States Dental Inst. v. American Ass'n of Orthodontists,* 396 F. Supp. 565 (N.D. Ill. 1975) (practice of dentistry and orthodontia does not fall outside the ambit of trade or commerce); *AMA v. FTC,* 455 U.S. 676, 71 L. Ed. 2d 546, 102 S. Ct. 1744 (1982) (per curiam) (equally divided Court affirmed 638 F.2d 443 (2d Cir. 1980)).

While federal courts have rejected professional immunity from the antitrust laws, state courts are split on this issue in construing their consumer protection laws. *See, e.g., Ivey, Barnum & O'Mara v. Indian Harbor Properties, Inc.,* 190 Conn. 528, 461 A.2d 1369 (1983) (client's counterclaim that law firm engaged in unfair trade act or practice by attempting to collect debt which it knew was not due and owing lacked "nexus with the public interest" and was properly dismissed); *Heslin v. Connecticut Law Clinic of Trantolo & Trantolo,* 190 Conn. 510, 461 A.2d 938 (1983) (unfair trade practices act, which regulates "the conduct of any trade or commerce", does not totally exclude all conduct of the profession of law); *Frahm v. Urkovich,* 113 Ill. App. 3d 580, 447 N.E.2d 1007 (1983) (legislature's use of "trade or commerce" in defining application of consumer fraud and deceptive business practices act was not meant to include the actual practice of law); *Reed v. Allison & Perrone,* 376 So. 2d 1067 (La. Ct. App. 1979) (advertising of legal services is clearly a "trade" or "commerce" under unfair trade practices and consumer protection law); *Matthews v. Berryman,* 196 Mont. 49, 637 P.2d 822 (1981) (attorney who told clients he would withdraw as counsel, unless they signed security agreement, held not to have committed unfair trade practices); *Lucas v. Nesbitt,* 653 S.W.2d 883 (Tex. Ct. App. 1983) (evidence was insufficient to support finding that attorney's conduct in billing client four times the amount he testified to under oath constituted a deceptive trade practice); *Barnard v. Mecom,* 650

S.W.2d 123 (Tex. Ct. App. 1983) (attorney's failure to release $5,000 worth of trust funds or pursue lawsuit held to violate deceptive trade practices act); *DeBakey v. Staggs,* 605 S.W.2d 631 (Tex. Civ. App. 1980) (purchase or acquisition of legal services covered by deceptive trade practices act), *aff'd,* 612 S.W.2d 924 (Tex. 1981).

Defendant urges a literal interpretation of the express language of the CPA. He contends attorneys sell "assets" and "services". RCW 19.86.010(2). Hence, their conduct falls within the trade or commerce provision of RCW 19.86.020. Defendant states the purposes of the act, *i.e.,* protection of the public from unfair or deceptive acts or practices, are served by its application to lawyers. RCW 19.86.920. He distinguishes *Lightfoot v. MacDonald,* 86 Wn.2d 331, 544 P.2d 88 (1976), as it never addressed whether an attorney's conduct was part of trade or commerce. Rather, *Lightfoot* is deemed the court's first attempt to articulate a theory which excluded from the act purely private disputes.

Plaintiffs, however, assert that, as RCW 19.86 was adopted virtually verbatim from federal antitrust laws, the Legislature is presumed to have intended "trade or commerce" to be interpreted in accordance with then–existing construction of that term under federal law. Since before 1961, federal law did not consider the learned professions to be part of trade or commerce, ergo, the practice of law cannot constitute trade or commerce under the CPA. Plaintiffs distinguish *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 44 L. Ed. 2d 572, 95 S. Ct. 2004 (1975) as dealing with commercial aspects of the legal profession, and not with the practice of law itself.

■ Guided by the legislative prescription to follow federal law (*see* discussion in *Heslin v. Connecticut Law Clinic,* 190 Conn. at 517–21) and to construe liberally the CPA, RCW 19.86.920, we hold that certain entrepreneurial aspects of the practice of law may fall within the "trade or commerce" definition of the CPA. The more recent federal cases stand for the principle that attorneys, as well as other

professionals, are not exempt from antitrust laws. The CPA, on its face, shows a carefully drafted attempt to bring within its reaches *every* person who conducts unfair or deceptive acts or practices in *any* trade or commerce. RCW 19.86.010(1) and (2); RCW 19.86.020. *Goldfarb v. Virginia State Bar, supra* at 787–88. There is no statutory exemption for lawyers. *Cf.* RCW 19.86.060; RCW 19.86.070; RCW 19.86.170. Moreover, to limit our interpretations to the inconclusive dictum of pre–1961 federal case law relative to the "learned profession" seems totally contrary to the legislative directive that the CPA be construed liberally. RCW 19.86.920.

Defendant's counterclaims do not principally attack the actual performance of Short and Cressman's legal advice and services. Nor is defendant urging that plaintiff attorneys be reprimanded, suspended, or disbarred. Rather, defendant's counterclaims primarily challenge the entrepreneurial aspects of legal practice—how the price of legal services is determined, billed, and collected and the way a law firm obtains, retains, and dismisses clients. These business aspects of the legal profession are legitimate concerns of the public which are properly subject to the CPA.

However, a few of defendant's claims as a matter of law are outside the purview of the CPA and were properly dismissed by the trial court. CR 12(b)(6). Defendant alleges plaintiffs' law firm neglected properly to gather essential facts and evaluate the dissolution of his real estate partnership such that settlement was untimely; to pursue claims against defendant's opponents causing him a loss of valuable rights; and failed in a timely manner to file a judgment in the second action. Defendant also claims that the judgment finally entered was defective in failing to hold one of defendant's opponents liable. These claims are not chiefly concerned with the entrepreneurial aspects of legal practice; rather, they concern the actual practice of law. Since these claims are directed to the competence of and strategy employed by plaintiffs' lawyers, they amount to allegations of negligence or malpractice and are exempt

from the CPA.

In reaching this result, we are cognizant of the important public policy interests at stake. Current remedies available to the victims of professional malpractice or misconduct have shortcomings. Comment, *The Washington Consumer Protection Act vs. The Learned Professional*, 10 Gonz. L. Rev. 435, 436 (1975). Most actions are expensive and difficult to prove. "The injured client can take little comfort from the fact that the wrongdoer has been reprimanded or suspended or stripped of the right to practice his profession." 10 Gonz. L. Rev. at 437. In some actions, only the prospects of attorney fees and potential treble damages provide a complete remedy. RCW 19.86.090. The CPA should be "available as an efficient and effective method of filling the gaps left vacant by the existing common law . . ." (footnote omitted), 10 Gonz. L. Rev. at 437, as well as the Code of Professional Responsibility.

## II

Next, we consider whether the application of the CPA to attorneys would be an unconstitutional legislative invasion of the jurisdiction of the Supreme Court in its power to regulate the practice of law. Const. art. 4, § 1 provides: "The judicial power of the state shall be vested in a supreme court . . ." The Supreme Court has an exclusive, inherent power to admit, enroll, discipline, and disbar attorneys. *Graham v. Washington State Bar Ass'n*, 86 Wn.2d 624, 548 P.2d 310 (1976). We have held the exercise of "'this power is necessary for the protection of the court, the proper administration of justice, the dignity and purity of the profession, and for the public good and the protection of clients'." *Seattle v. Ratliff*, 100 Wn.2d 212, 215, 667 P.2d 630 (1983) (quoting *In re Bruen*, 102 Wash. 472, 475, 172 P. 1152 (1918)). Furthermore,

> "'the power to make the necessary rules and regulations governing the bar was intended to be vested exclusively in the supreme court, free from the dangers of encroachment either by the legislative or executive branches.'"

*Hagan & Van Camp, P.S. v. Kassler Escrow, Inc.,* 96 Wn.2d 443, 453, 635 P.2d 730 (1981) (quoting *Graham v. Washington State Bar Ass'n,* 86 Wn.2d 624, 633, 548 P.2d 310 (1976)).

Plaintiffs assert application of the CPA to the practice of law violates the separation of powers doctrine. *See Hagan & Van Camp,* at 452–53 (RCW 19.62, which permitted nonattorneys to select and prepare documents for real estate transactions, unconstitutionally infringed upon the court's inherent power to regulate the practice of law). Plaintiffs maintain defendant's complaints are regulated by the court (*i.e.,* disciplinary rules) and cannot be shared with the Legislature. The legal profession is claimed to be the most strictly regulated of all professions and plaintiffs state that to allow regulation of lawyers by a "politically motivated" Legislature is not in the public interest.

Defendant contends application of the CPA to lawyers does not violate the court's power to regulate the practice of law. He analogizes that criminal laws (*i.e.,* criminal fraud) could not be applied to attorneys if plaintiffs' position was adopted. Moreover, defendant criticizes plaintiffs' failure to show that applying the CPA to lawyers would interfere with the court's powers.

Amicus curiae, Washington State Attorney General, relying on *In re Bruen,* 102 Wash. 472, 172 P. 1152 (1918), argues the separation of powers doctrine does not create an impenetrable barrier through which the Legislature may not venture. Rather, the exclusive power of the court lies in determining who may practice law and who, once admitted, shall be suspended or disbarred from such practice. The corollary, according to amicus, is that the Legislature may constitutionally act with regard to attorneys so long as its enactments do not affect or purport to take away the court's power to admit, suspend, or disbar.

In *Bruen,* an attorney challenged a 1917 act which delegated authority to the board of law examiners to determine his fitness to practice law as an unconstitutional encroachment on judicial powers. The court upheld the constitu-

tionality of the act, except for the provision for a final order by the board. Final judgments on disbarment were to come from the court. 102 Wash. at 481. In relating the two powers the court stated:

> The cases are fairly uniform upon the proposition that admitting to practice, suspending, and disbarring are judicial functions. The legislative power, in the interest of uniformity of standard and to remedy and prevent mischiefs in the profession, may regulate and restrict this power, but cannot take it away. It may provide machinery for the administration of the regulation provided by the legislature, as in carrying into effect such regulations some agency is necessary.

102 Wash. at 477.

Similarly, in *Heslin v. Connecticut Law Clinic of Trantolo & Trantolo,* 190 Conn. 510, 461 A.2d 938 (1983), the Connecticut Supreme Court recognized the judicial disciplinary system and consumer protection laws have different functions and there is no reason why they cannot coexist.

> We should not permit the special relationship of attorneys to the judiciary to blind us to the fundamental importance of the relationship of attorneys to their clients. Although the canons of ethics and the disciplinary rules of the Code of Professional Responsibility purport to govern both the official and the private aspects of the practice of law, the code's emphasis is consistently ethical and regulatory. [CPA], by contrast, is primarily addressed to the pragmatic concerns of the public; it emphasizes prevention of injury to the consumer of legal services and redress to those injured by attorney misconduct. [CPA] in no way relieves attorneys of the ethical duties imposed on them by the code. For the conduct that [CPA] declares illegal, it provides distinctly separate remedies, different both in purpose and in form from the scheme of regulation envisaged by the code. We recognize that [CPA's] distinct form and purpose do not, by themselves, guarantee that the judiciary's disciplinary power will continue to operate in an unhindered fashion. The defendant has not, however, demonstrated the contrary. A priori, there is no reason why the code and [CPA] cannot coexist.

(Footnotes and citations omitted.) 190 Conn. at 525–26. *Cf.*

*Goldfarb v. Virginia State Bar,* 421 U.S. 773, 793, 44 L. Ed. 2d 572, 95 S. Ct. 2004 (1975) ("[i]n holding that certain anticompetitive conduct by lawyers is within the reach of the Sherman Act we intend no diminution of the authority of the State to regulate its professions").

 While we should jealously protect our prerogatives, if the legislative power is not limited by the constitution, it should be unrestrained. *Moses Lake Sch. Dist. 161 v. Big Bend Comm'ty College,* 81 Wn.2d 551, 555, 503 P.2d 86 (1972), *appeal dismissed,* 412 U.S. 934 (1973). This is in accordance with our presumption in favor of the constitutionality of legislative acts. *Crane Towing, Inc. v. Gorton,* 89 Wn.2d 161, 169, 570 P.2d 428, 97 A.L.R.3d 482 (1977). Accordingly, we hold the CPA does not trench upon the constitutional powers of the court to regulate the practice of law.

 Closely connected with the constitutional argument is the ruling of the trial court that defendant's CPA claim must be dismissed because he "has pled and does have other adequate remedies available to him." In support of this view the trial court cited *Lightfoot v. MacDonald,* 86 Wn.2d 331, 544 P.2d 88 (1976). *Lightfoot,* however, does not support this position. Rather, it said that the CPA does not "provide an additional remedy for private wrongs which do not affect the public generally." *Lightfoot,* at 333. Implicit in this statement and in the thrust of *Lightfoot* is the view that the CPA was to give an additional remedy to those who have suffered a wrong which does impact the public interest. That this is the correct interpretation of *Lightfoot* is borne out by cases such as *Salois v. Mutual of Omaha Ins. Co.,* 90 Wn.2d 355, 360, 581 P.2d 1349 (1978) and *Thomas v. French,* 30 Wn. App. 811, 813, 638 P.2d 613 (1981).

To conclude, lawyers may be subject to liability under the CPA. We hold entrepreneurial aspects of the practice of law, which are principally counterclaimed by defendant, fall within the sphere of "trade or commerce" under RCW 19.86.010(2) and 19.86.020. As to such claims, we reverse

the trial court's dismissal of defendant's CPA counterclaims. Defendant's claims which purely allege negligence or legal malpractice are exempt from the CPA and were properly dismissed under CR 12(b)(6). While we hold the term "conduct of any trade or commerce" does not exclude all conduct of the profession of law, we do not decide in this case whether the CPA applies to every aspect of the practice of law in this state as to the performance of legal services. Whether Demopolis at trial can satisfy the *Anhold* public interest test or other requirements of the CPA is beyond our scope of review. *Anhold v. Daniels,* 94 Wn.2d 40, 46, 614 P.2d 184 (1980).

Finally, we hold application of the CPA to entrepreneurial aspects of the practice of law does not violate the separation of powers doctrine.

DIMMICK, J., and CUNNINGHAM, J. Pro Tem., concur.

DORE, J. (concurring)—I concur in much of the reasoning and the result of the majority's opinion. Applying the Consumer Protection Act (CPA) to the business aspect of the practice of law will complement the sanctions provided by the Professional Code of Ethics. The Washington State Bar Association (Bar), through the Code of Professional Responsibility, has done an effective job in regulating the legal profession. Only last year, an entirely new set of rules for lawyer discipline went into effect. One such rule allows the Bar to order restitution in favor of clients harmed by a lawyer's misconduct. In addition, the Bar has streamlined its disciplinary review procedures. The full disciplinary board no longer needs to review each complaint; instead, there are now four subcommittees that have authority to act on individual complaints. These new rules and procedures have allowed the Bar to provide more efficient supervision of the profession. See Farrell, *The Washington Lawyer Discipline System: A Statistical View: 1981–1984,* 38 Wash. State Bar News No. 10, at 19 (Oct. 1984). By applying the CPA to the business aspect of the practice of

law, we can provide one more enforcement device for the consumer without questioning judgment decisions made by the attorney.

There is at least one circumstance, however, where the CPA should not be limited solely to the business practice of lawyers. That circumstance exists when lawyers engage in deceptive advertising. I have recently reviewed the various advertisements of law firms advertising in the Seattle–King County telephone directory. All attorney advertisements I observed appeared proper and professional. All such lawyers, of course, are members of the Washington State Bar Association and residents of our state. However, I am somewhat concerned with national law firms that are now rising in our cities and towns. The spokesman for one such firm alluded to the success of their methods by saying that in a period of less than 10 years they have set up 243 fully functioning legal clinics, located in most of the states in the United States. The success of their operation is effectuated by a massive media campaign including newspaper advertisements, television and radio, and by offering reduced or discount fees. Undoubtedly, this will be the forerunner of many other national firms that shortly will probably arrive in our state.

These firms may be beneficial for residents, in that they provide some legal services at relatively low cost. However, they also have the potential for deceiving the general public through their advertisements. Advertising poses a special problem. On the one hand, it can provide information so consumers can make an informed choice in selecting an attorney. On the other, it has the potential for deceiving a large number of people and resultant damage. To insure that consumers can rely on all attorney advertising, an effective penalty should be imposed for deceptive advertising which causes damage. I believe that damage to a client resulting from deceptive advertising should be compensable through the CPA. An example: A lawyer advertises that he charges an hourly fee of $20 an hour. However, such a fee is only for the initial consultation and the lawyer charges $80

an hour thereafter but he fails to mention this in his advertisements. Another example would be if the deceptive-advertising lawyer, through his negligence, mishandles the client's case in such a way as to cause the client a loss. Normally the latter loss would not fall within the purview of the CPA since it goes to the competence of an attorney. In this example, however, it should be subject to the CPA since the loss was a direct result of the initial advertising deception. This position is fair, in that the client would not have suffered the loss but for the deceptive advertisement.

The majority opinion is an innovative solution to the problem of how the CPA should be applied to the practice of law. Since it is novel, we should proceed cautiously in applying it to different factual situations. The reason for my concurrence is to provide guidance regarding the extent to which the CPA may be applied to deceptive advertising. This position is compatible with the majority's opinion, as the majority itself states that "we do not decide in this case whether the CPA applies to every aspect of the practice of law in this state as to the performance of legal services." Majority opinion, at 66. By allowing a client to recover damages caused by deceptive advertising, the public will be assured that it can rely on the representations made in attorney advertisements.

PEARSON, J. (concurring in part)—I concur in the result reached by the majority opinion. However, I am somewhat puzzled by some of the language contained therein. Therefore, I think it best to examine more closely the rationale behind our decision.

The question of whether professional activities of attorneys, as members of a "learned profession", can constitute "trade or commerce" was answered in the affirmative in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 44 L. Ed. 2d 572, 95 S. Ct. 2004 (1975). The Court there held that minimum fee schedules, published by a county bar association and enforced by the state bar, violated the Sherman Act, 15 U.S.C. § 1 (1976). The Court rejected the argument that the

bar association was automatically exempted from antitrust regulation because learned professions were not "trade or commerce", noting that such a "sweeping exclusion" would allow lawyers to adopt anticompetitive practices with impunity. *Goldfarb*, at 787.

It is of critical importance to note, however, that *Goldfarb* dealt only with the "business aspect" of the law profession. *See Goldfarb*, 421 U.S. at 788. The same is true of other federal cases imposing liability upon lawyers under the Sherman Act. Many of these cases are discussed by the majority. These cases dealt with price fixing agreements and other anticompetitive devices, rather than the actual practice of law. To fail to make this distinction would be to equate the actual practice of law with ordinary commercial enterprise, something which the Court in *Goldfarb* expressly refused to do. "It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas." *Goldfarb*, at 788 n.17.

This commercial–noncommercial distinction was sharply drawn in *Marjorie Webster Junior College, Inc. v. Middle States Ass'n of Colleges & Secondary Schs., Inc.*, 432 F.2d 650 (D.C. Cir.), *cert. denied*, 400 U.S. 965 (1970), where the court held that refusal by the association to accredit plaintiff college was not a restraint of trade. In so holding, the court stated that the "proscriptions of the Sherman Act were 'tailored * * * for the business world,' not for the noncommercial aspects of the . . . learned professions." *Marjorie Webster*, at 654. *See also Frahm v. Urkovich*, 113 Ill. App. 3d 580, 447 N.E.2d 1007 (1983) (legislature's use of "trade or commerce" in consumer protection statute was not meant to include the actual practice of law). The rationale of *Marjorie Webster* and *Frahm*, together with the narrowness of the Court's opinion in *Goldfarb*, mandate a conclusion that the direction of the law is toward validating judicial exemptions for noncommercial aspects of the professions.

The majority properly makes this commercial–noncommercial distinction, holding that the entrepreneurial aspects of legal practice fall within the sphere of "trade or commerce" under RCW 19.86.020 while allegations primarily concerning professional malpractice do not involve "trade or commerce". I am in complete accord with this holding.

I am puzzled, however, by some of the dictum which appears in the majority opinion. My first concern is with the majority's discussion of the "important public policy interests at stake" in this case. After noting that "[c]urrent remedies available to the victims of professional malpractice or misconduct have shortcomings", the majority concludes that "[t]he CPA should be 'available as an efficient and effective method of filling the gaps left vacant by the existing common law . . .'" Majority, at 62. This language appears to me to be inconsistent with that portion of our holding which excludes claims of professional malpractice from the purview of the Consumer Protection Act (CPA); it leaves one with the impression that the CPA should be applied to all aspects of legal practice, rather than just to the business aspect.

There are sound reasons of public policy, not discussed by the majority, supporting the commercial–noncommercial distinction we adopt in this case. Our state's Consumer Protection Act has no general requirement of fault. All that is required is that an act complained of must: (1) impact the public interest, (2) be within the sphere of trade or commerce, and (3) be unfair or deceptive. With respect to this last factor, the rule in this state is that:

> An "unfair or deceptive practice" does not require a finding of an intent to deceive or defraud and therefore good faith on the part of the seller is immaterial. . . . To constitute a deceptive practice, the [act] need only have a tendency or *capacity* to deceive a substantial portion of the purchasing public.

*Fisher v. World–Wide Trophy Outfitters,* 15 Wn. App. 742, 748, 551 P.2d 1398 (1976). *See also Haner v. Quincy Farm*

*Chems., Inc.,* 97 Wn.2d 753, 649 P.2d 828 (1982). Thus, if the act complained of was in fact deceptive, although done with the best of intentions, liability could result under the CPA regardless of the care taken in providing the service. Such a state of affairs would make it virtually impossible for an attorney to effectively perform the traditional role of legal counselor. The law is often vague and unsettled; several legal opinions are often possible, especially in borderline cases. Liability should be imposed only where an attorney has failed to use due care to serve a client. Imposition of liability under the CPA, however, would require an attorney to guarantee much more than just the care used in forming his opinions. Since even a carefully rendered opinion could, if incorrect, have the capacity to deceive, the attorney would have to insure the correctness of his opinions and strategies. I sincerely doubt that the CPA was intended to so radically alter the standard of care owed by lawyers and other professionals.

I am also uncertain what the majority means when it states:

> While we hold the term "conduct of any trade or commerce" does not exclude all conduct of the profession of law, we do not decide in this case whether the CPA applies to every aspect of the practice of law in this state as to the performance of legal services.

Majority, at 66. It seems to me, by excluding claims which primarily concern professional malpractice from the purview of the CPA, we have necessarily decided that the CPA does not apply to every aspect of the practice of law in this state.

Finally, I would emphasize that our holding merely places certain types of conduct within the scope of the term "trade or commerce" as that term is used in RCW 19.86-.020. We do *not* hold that such conduct violates RCW 19.86. The procedural posture of this case does not allow us to determine whether the public interest requirement of *Anhold v. Daniels,* 94 Wn.2d 40, 46, 614 P.2d 184 (1980)

has been met. That question has been saved for another day.

WILLIAMS, C.J., BRACHTENBACH, J., and HAMILTON, J. Pro Tem., concur with PEARSON, J.

ROSELLINI, J. (dissenting)—The majority of this court perceives that the Consumer Protection Act (RCW 19.86) has an appropriate place in the regulation of the practice of law. I believe the correct rule of law would prohibit application of the Consumer Protection Act to the practice of law, as it intrudes upon the judiciary's exclusive jurisdiction to regulate the practice of law.

The majority apparently takes the position that this court's exclusive authority to regulate the practice of law is limited to regulating admission to and suspension from the bar. However, all of the conduct here complained of is regulated by this court in order to protect the public interest. Although the majority has not disputed the court's inherent authority to regulate the practice of law by promulgating and enforcing the Code of Professional Responsibility and disciplinary rules, it apparently does not believe that the authority for such regulation is exclusively the province of this court. Instead, the majority finds that the conduct of attorneys in representing their clients may be regulated by the Legislature through statutes such as the Consumer Protection Act, thus thereby permitting some sort of vague dual existence between regulation by the Legislature and by this court.

This court rejected just this type of dual regulation in *State ex rel. Schwab v. Washington State Bar Ass'n*, 80 Wn.2d 266, 493 P.2d 1237 (1972). In *Schwab*, we held the State Bar Act, RCW 2.48, to be merely advisory in nature, and therefore not impinging upon the court's exclusive authority to regulate the legal profession. We found that this court's exclusive and constitutional authority to regulate the practice of law left no room for the "vague dual existence" of conditions for the practice of law.

First, we have held repeatedly that *only* the Supreme Court has the power to suspend one from the practice of law or to take other disciplinary action. *In re Bruen,* 102 Wash. 472, 172 P. 1152 (1918); *In re Ballou,* 48 Wn.2d 539, 295 P.2d 316 (1956); *In re Simmons,* 59 Wn.2d 689, 369 P.2d 947 (1962); *see also Clark v. Washington,* 366 F.2d 678 (9th Cir. 1966).

Second, RCW 2.48.060 provides generally that the board of governors has the power to prescribe rules, establish procedures and to carry out the investigation, prosecution and hearing of all cases involving *discipline, disbarment, suspension, or reinstatement.* It also provides that the board may make *recommendations* thereon to the Supreme Court. However, all such power is specifically made subject to the approval of the Supreme Court.

The foregoing statute and our past decisions make it evident that this court does not share the power of discipline, disbarment, suspension or reinstatement with either the legislature or the state bar association. The ultimate constitutional power clearly lies within the *sole jurisdiction* of the Supreme Court. This point is conceded in the brief of the respondent bar association.

Such constitutional concept leaves no room for the notion that a lawyer's authority to practice law is subject to some vague dual existence, one part of which may be terminated by the bar's suspension of his *membership* while the other (*i.e.,* his authority to *practice law* before the courts) is subject to control of the Supreme Court. In short, membership in the state bar association and authorization to continue in the practice of law coexist under the aegis of one authority, the Supreme Court.

*Schwab,* at 269.

Likewise, the court's exclusive authority to *discipline* lawyers leaves no room for joint control by the Legislature. The Code of Professional Responsibility establishes the standard to be met by lawyers, and the disciplinary rules the method of enforcement. *In re Steinberg,* 44 Wn.2d 707, 715, 269 P.2d 970 (1954). The disciplinary rules of the Code of Professional Responsibility, not the Consumer Protection Act, must govern the profession's conduct. This our rules adequately, efficiently and justly do.

The disciplinary rules prohibit the alleged conduct at issue in this action. Petitioner's answer and counterclaim set forth, in essence, allegations concerning misrepresentations, excessive fees, threatened withdrawal of representation, and neglect. Such alleged improprieties by an attorney in the conduct of his representation of a client are closely regulated by the disciplinary rules.

CPR DR 1–102 prohibits misrepresentation of any kind by an attorney. It provides, in part:

(A) A lawyer shall not:

. . .

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

CPR DR 2–106 regulates in detail the amount of a fee which may be charged by an attorney. That rule provides:

(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.
(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:
(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
(3) The fee customarily charged in the locality for similar legal services.
(4) The amount involved and the results obtained.
(5) The time limitations imposed by the client or by the circumstances.
(6) The nature and length of the professional relationship with the client.
(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
(8) Whether the fee is fixed or contingent.

CPR DR 2–110 regulates in detail the circumstances under which an attorney is permitted to withdraw his rep-

resentation of a client. It provides, in part:

(C) Permissive Withdrawal. If [DR 2–110(B)] is not applicable, a lawyer may not request permission to withdraw in matters pending before a tribunal, and may not withdraw in other matters, unless such request or such withdrawal is because:
(1) His client:

(d) By other conduct renders it unreasonably difficult for the lawyer to carry out his employment effectively.
(e) Insists, in a matter not pending before a tribunal, that the lawyer engage in conduct that is contrary to the judgment and advice of the lawyer but not prohibited under the disciplinary rules.
(f) Deliberately disregards an agreement or obligation to the lawyer as to expenses or fees.

CPR DR 6–101 regulates the neglect by a lawyer of a matter entrusted to him. That rule provides:

(A) A lawyer shall not:
(1) Handle a legal matter which he knows or should know that he is not competent to handle, without associating with him a lawyer who is competent to handle it.
(2) Handle a legal matter without preparation adequate in the circumstances.
(3) Neglect a legal matter entrusted to him.

Finally, CPR DR 2–102(B) and (C) have been interpreted to establish a primary obligation of lawyers associated in practice not to mislead the client as to who is responsible to the client. *Koehler v. Wales,* 16 Wn. App. 304, 309, 556 P.2d 233 (1976).

As the purpose of regulation of the conduct of attorneys by this court is to protect the public interest, *Washington State Bar Ass'n v. Great W. Union Fed. Sav. & Loan Ass'n,* 91 Wn.2d 48, 60–61, 586 P.2d 870 (1978), violation of any of the disciplinary rules may result in suspension or censure. *See, e.g., In re Loomos,* 90 Wn.2d 98, 579 P.2d 350 (1978). Moreover, all conduct which violates these rules is expected to result in disciplinary proceedings. *In re Droker,* 59 Wn.2d 707, 720, 370 P.2d 242 (1962). If proceedings are not

brought when proper, a petition may be brought to compel proceedings. *Dodd v. Bannister,* 86 Wn.2d 176, 543 P.2d 237 (1975).

The majority asserts that the Consumer Protection Act does not regulate attorneys at all, but merely creates a private damage action for consumers. This position is untenable in at least two respects. First, it is obvious that legal culpability for acts within the practice of law affects the way lawyers will operate their practice. As noted above, this power lies exclusively with the Supreme Court. Second, this court has held that the Consumer Protection Act is more akin to a regulatory statute than a private remedy statute. The majority's position conflicts with this view of the Consumer Protection Act, because an action may not be maintained unless a public interest has been demonstrated. Thus, it is fiction to view the Consumer Protection Act's application to lawyers as nonregulatory.

The majority relies primarily on *Heslin v. Connecticut Law Clinic of Trantolo & Trantolo,* 190 Conn. 510, 461 A.2d 938 (1983). In that case, however, the court misanalyzed the purpose of regulation of the practice of law by the judiciary. In *Heslin,* the Connecticut Commissioner of Consumer Protection issued an investigative demand to the defendant law clinic as part of an official investigation of actions alleged to violate the Connecticut Unfair Trade Practices Act (CUTPA). The demand requested production of information relative to an investigation by the commissioner of practices alleged to violate CUTPA. The allegedly unfair practices included use of the terms "clinic" and "law clinic" in the clinic's advertising, misrepresentations as to fees, and referrals of clients which resulted in clients paying higher than the advertised fees. The clinic refused to comply with the investigative demand, and the commissioner sought a court order compelling compliance. The trial court found that the regulation of attorney conduct is a matter exclusively within the control of the judiciary and dismissed the commissioner's application. The Supreme Court of Connecticut reversed. In doing so, however, it employed

fallacious and unsound reasoning of a type this court can and, I respectfully submit, should avoid.

The Connecticut court's reasoning rests upon a distinction between the "ethical and regulatory" function of the Code of Professional Responsibility and the "pragmatic concerns of the public" which are the concern of CUTPA. *Heslin,* 190 Conn. at 525. In its analysis, the court conceded that CUTPA "unquestionably deals with subject matter that is within the judicial power." *Heslin,* 190 Conn. at 523. It also acknowledged that

> [s]ince attorney advertising, referrals by attorneys to other legal practitioners, and fee arrangements between attorneys and clients are regulated by the disciplinary rules of the code[,] . . . enforcement of the code may provide sanctions for wrongful practices which also violate CUTPA.

*Heslin,* 190 Conn. at 523–24. Moreover, the court admitted that attorneys have a "special relationship with the judiciary" because of their "unique position as officers and commissioners of the court". *Heslin,* 190 Conn. at 524. But the Connecticut Supreme Court then proceeded to ignore all of these valid and important factors in favor of a spurious distinction between the purpose of the code and the purpose of the Consumer Protection Act:

> We should not permit the special relationship of attorneys to the judiciary to blind us to the fundamental importance of the relationship of attorneys to their clients. Although the canons of ethics and the disciplinary rules of the Code of Professional Responsibility purport to govern both the official and the private aspects of the practice of law, the code's emphasis is consistently ethical and regulatory. CUTPA, by contrast, is primarily addressed to the pragmatic concerns of the public; it emphasizes prevention of injury to the consumer of legal services and redress to those injured by attorney misconduct.

*Heslin,* 190 Conn. at 525. The Connecticut court's own statements demonstrate the fallacy of the distinction drawn. The Code of Professional Responsibility does not deal solely with aspects of the practice of law which may be

considered purely ethical. It deals in concrete and specific ways with pragmatic and practical aspects of the relationship between attorneys and clients. It deals with legal fees, with suits to collect those fees, with referrals from one attorney to another, with advertising, and with numerous other practical concerns.

While the Connecticut court suggested that the matters dealt with by the code can somehow be divided between those which may also be regulated by consumer protection statutes and those which cannot, this is not the case. The code deals with each aspect of the relationship between an attorney and his or her client. It cannot be artificially divided. No basis exists for distinguishing between "ethical" and "pragmatic" concerns of the code. Consequently, the reasoning of *Heslin* is fundamentally unsound and should be rejected by this court.

Furthermore, the *Heslin* court views the purpose of the Connecticut Code of Professional Responsibility differently than have we. Unlike Connecticut, we have unequivocally held that the sole purpose of the code is to protect the public. *Washington State Bar Ass'n v. Great W. Union Fed. Sav. & Loan Ass'n, supra.* Because RCW 19.86.020 applies only to conduct which impacts the public interest, when the Consumer Protection Act is applied to the conduct of lawyers in the private representation of a client, it intrudes upon this court's protection of the public interest through the regulation of the practice of law.

Our constitution prohibits this result. Const. art. 4, § 1 provides: "The judicial power of the state shall be vested in a supreme court . . .". Inherent in this constitutionally granted power is this court's inviolate authority to regulate the practice of law. *Seattle v. Ratliff*, 100 Wn.2d 212, 215, 667 P.2d 630 (1983). This power to regulate the practice of law is solely within the province of the judiciary. *Hagan & Van Camp, P.S. v. Kassler Escrow, Inc.*, 96 Wn.2d 443, 453, 635 P.2d 730 (1981). Judicial formation of rules and regulations governing the practice of law must proceed—unhampered—by encroachment from other branches of

government. *Graham v. Washington State Bar Ass'n,* 86 Wn.2d 624, 548 P.2d 310 (1976). Finally, the exercise of this power is necessary for the protection of the court and the proper administration of justice, and serves the public good by protecting the clients. *Ratliff,* at 215.

For these reasons, I would hold that application of the Consumer Protection Act to the practice of law is an unconstitutional infringement upon the exclusive jurisdiction of this court to regulate the practice of law.