[No. 80665-9.  En Banc.]
Argued October 21, 2008.    Decided February 5, 2009.

MYSTIE "PATSY" MICHAEL, *Respondent*, v. BETSY MOSQUERA-LACY, *Defendant*, BRIGHT NOW! DENTAL, INC., *Petitioner*.

596

598

*Christopher W. Tompkins* and *Stacia R. Hofmann* (of *Betts Patterson & Mines, PS*), for petitioner.

*Lincoln C. Beauregard* (of *Connelly Law Offices*), for respondent.

¶1 SANDERS, J. — Dr. Betsy Mosquera-Lacy, a periodontist employed by Bright Now! Dental, Inc., performed a bone grafting procedure on Mystie Michael using cow bone although Michael requested that no cow bone be used. Michael sued Bright Now and Dr. Mosquera-Lacy for Consumer Protection Act (CPA), chapter 19.86 RCW, violations. The trial court dismissed the complaint on summary judgment. The Court of Appeals reversed the trial court, holding that material issues of fact did exist. We now reverse the Court of Appeals. Bright Now is entitled to summary judgment of dismissal as a matter of law on the CPA claim.

## FACTUAL AND PROCEDURAL HISTORY

¶2 Bright Now offers dental care and periodontal services to the public. Dr. Mosquera-Lacy was a periodontist employed by Bright Now, and Michael was her patient at Bright Now who required a bone grafting procedure. Michael filled out a preprocedure form indicating she was allergic to Lidocaine, and this form was placed in her chart. Michael's primary care doctor also told Bright Now that Michael had seizures when she took Lidocaine and to test her for other anesthesia options before her procedure. Bright Now never performed any such tests on Michael.

¶3 Dr. Mosquera-Lacy told Michael about the different types of bones that could be used for the bone grafting procedure, which included cow bone (xenograft), human bone (allograft), and synthetic bone. Michael told Katie Guthrie, Bright Now's customer service representative, she did not want cow bone used for her bone graft, and Guthrie told Dr. Mosquera-Lacy of Michael's request. Dr. Mosquera-

Lacy told Guthrie that she typically uses cow bone for bone grafting procedures but could use a different type of bone for Michael's procedure.

¶4 Dr. Mosquera-Lacy performed the bone grafting procedure on Michael several months later. Before the procedure, Michael was given seven Lidocaine caplets as an anesthetic and requested to see the bone being used for her procedure. When Michael asked if the bone was a human bone, Dr. Mosquera-Lacy told her it was a cow bone. Michael told Dr. Mosquera-Lacy that she had already requested that human bone be used because she could not fathom the thought of having animal parts in her body. Dr. Mosquera-Lacy told Michael she had a human bone in the back she would use and went to retrieve it. When Dr. Mosquera-Lacy returned with the new bone, Michael did not ask her if it was a human bone. During the procedure, Dr. Mosquera-Lacy ran out of human bone and used some cow bone to finish the bone grafting.[1]

¶5 Michael became very ill after the surgery due to the Lidocaine and was rushed to the hospital by paramedics. Dr. Mosquera-Lacy and Michael spoke on the phone several times during Michael's recovery. During one such phone call, Dr. Mosquera-Lacy told Michael that she had used cow bone during her procedure because she did not have enough human bone.

¶6 Bright Now did not charge Michael for the bone graft. Michael was also reimbursed $75 by Bright Now for her trip to the emergency room. As compensation Dr. Mosquera-Lacy usually receives 35 percent of what Bright Now charges its patients, but she was not paid for Michael's bone grafting procedure because Michael was not charged.

¶7 Michael sued Dr. Mosquera-Lacy and Bright Now for negligence, medical battery, and CPA violations. The trial court granted partial summary judgment, dismissing the

---

[1] The exact amount of cow bone used for the bone graft procedure is unknown. Dr. Mosquera-Lacy says she only used "a little sprinkle of xenograft to fill it up," estimating she used about "10 percent xenograft." Clerk's Papers at 21. Michael argues Dr. Mosquera-Lacy "implanted" a cow bone in her mouth. *Id.* at 70.

CPA claims against Dr. Mosquera-Lacy and Bright Now. Michael then settled the negligence and medical battery claims against Dr. Mosquera-Lacy, who is no longer a party to this action. Michael voluntarily dismissed her negligence and medical battery claims against Bright Now to appeal the trial court's summary judgment dismissing the CPA claim. Michael alleges Bright Now violated the CPA when Dr. Mosquera-Lacy used cow bone instead of human bone during her bone grafting procedure.

¶8 Division Two of the Court of Appeals reversed the trial court in a two to one decision, holding that material issues of fact existed as to several elements of the CPA. *Michael v. Mosquera-Lacy*, 140 Wn. App. 139, 165 P.3d 43 (2007). We granted review. 163 Wn.2d 1033, 187 P.3d 268 (2008).

## STANDARD OF REVIEW

¶9 We review summary judgment de novo. *City of Sequim v. Malkasian*, 157 Wn.2d 251, 261, 138 P.3d 943 (2006). "Summary judgment is appropriate when 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.' " *Locke v. City of Seattle*, 162 Wn.2d 474, 483, 172 P.3d 705 (2007) (alteration in original) (quoting CR 56(c)). When determining whether an issue of material fact exists, the court construes all facts and inferences in favor of the nonmoving party. *See Reid v. Pierce County*, 136 Wn.2d 195, 201, 961 P.2d 333 (1998). A genuine issue of material fact exists only where reasonable minds could reach different conclusions. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

¶10 Summary judgment is subject to a burden shifting scheme. "After the moving party submits adequate affidavits, the nonmoving party must set forth specific facts which sufficiently rebut the moving party's contentions and disclose the existence of a genuine issue as to a material fact." *Meyer v. Univ. of Wash.*, 105 Wn.2d 847, 852, 719 P.2d

98 (1986). To establish the existence of a genuine issue of material fact, the nonmoving party "may not rely on speculation, [or] argumentative assertions that unresolved factual issues remain." *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986). As the moving party, Bright Now has the burden to prove it is entitled to prevail as a matter of law on the facts construed most favorably to the nonmoving party, Michael.

## ANALYSIS

■ ¶11 To establish a CPA violation, the plaintiff must prove five elements: (1) an unfair or deceptive act or practice that (2) occurs in trade or commerce, (3) impacts the public interest, (4) and causes injury to the plaintiff in her business or property, and (5) the injury is causally linked to the unfair or deceptive act. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986). A plaintiff alleging injury under the CPA must establish all five elements. *Id.* The CPA should be liberally construed. *Salois v. Mut. of Omaha Ins. Co.*, 90 Wn.2d 355, 358, 581 P.2d 1349 (1978).

■■ ¶12 Bright Now contends that the use of cow bone for Michael's procedure did not occur in trade or commerce. We agree. "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW 19.86.020. " 'Trade' and 'commerce' shall include the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington." RCW 19.86.010(2). The CPA attempts "to bring within its reach[ ] *every* person who conducts unfair or deceptive acts or practices in *any* trade or commerce." *Short v. Demopolis*, 103 Wn.2d 52, 61, 691 P.2d 163 (1984). "[L]earned professions are not exempt from application of the Consumer Protection Act." *Quimby v. Fine*, 45 Wn. App. 175, 180, 724 P.2d 403 (1986).

¶13 "The term 'trade' as used by the Consumer Protection Act includes only the entrepreneurial or commercial

aspects of professional services, not the substantive quality of services provided." *Ramos v. Arnold*, 141 Wn. App. 11, 20, 169 P.3d 482 (2007). The question is whether the claim involves entrepreneurial aspects of the practice or mere negligence claims, which are exempt from the CPA. *Short*, 103 Wn.2d at 61. "Claims directed at the competence of and strategies employed by a professional amount to allegations of negligence and are exempt from the Consumer Protection Act." *Ramos*, 141 Wn. App. at 20.

¶14 In a legal practice entrepreneurial aspects include "how the price of legal services is determined, billed, and collected and the way a law firm obtains, retains, and dismisses clients." *Short*, 103 Wn.2d at 61. In *Quimby*, the court found no reason "to distinguish the legal practice from the medical practice" for CPA claims. *Quimby*, 45 Wn. App. at 180. Other cases follow the same principles established in *Short* to define the entrepreneurial aspects of learned professions, including medical professionals, as billing and obtaining and retaining patients. *Ramos*, 141 Wn. App. at 20; *Jaramillo v. Morris*, 50 Wn. App. 822, 827, 750 P.2d 1301 (1988). Entrepreneurial aspects do not include a doctor's skills in examining, diagnosing, treating, or caring for a patient. *Wright v. Jeckle*, 104 Wn. App. 478, 485, 16 P.3d 1268 (2001).

¶15 Michael argues Bright Now engaged in trade or commerce because it solicited and retained patients by representing that human bone could be used for bone grafting procedures. There is no evidence Bright Now advertised or marketed the availability of human bone for bone grafting procedures, nor did Bright Now solicit patients based on the availability of human bone. Dr. Mosquera-Lacy told Michael that she could use human bone instead of cow bone only *after* Michael became a patient at Bright Now.

¶16 In *Wright, id.* at 480, a doctor solicited patients by advertising a weight loss program that used a diet drug that could be purchased only at the doctor's office. The doctor "was not practicing medicine" but "was in the

business of selling diet drugs," so the court ruled the plaintiff had a valid CPA claim. *Id.* at 485. But here Dr. Mosquera-Lacy was practicing medicine by treating and caring for Michael, not soliciting patients by advertising the use of human bone for bone grafting procedures. She was not in the business of selling cow bone or human bone.

¶17 In *Benoy v. Simons*, 66 Wn. App. 56, 65, 831 P.2d 167 (1992), the Benoys claimed a doctor was "deceptive and unfair in retaining [their son] as a patient" because he "led them to believe the care given to [their son] was required when it actually had no beneficial value." The court found there was "no showing Dr. Simon's decision to maintain [their son] on the ventilator was influenced by any entrepreneurial motives on his part." *Id.* Similarly, Dr. Mosquera-Lacy did not have any proven entrepreneurial motive to use cow bone to finish Michael's procedure. She simply completed the procedure to the best of her ability with the materials available to her.

¶18 Michael failed to show that Dr. Mosquera-Lacy's use of cow bone is entrepreneurial. It does not relate to billing or obtaining and retaining patients. It simply relates to Dr. Mosquera-Lacy's judgment and treatment of a patient. There is no evidence that cow bone was used to increase profits or the number of patients. When the supply of human bone ran out during the procedure, Dr. Mosquera-Lacy used her judgment and skills as a periodontist to finish the procedure. This is not actionable under the CPA.

¶19 We hold Dr. Mosquera-Lacy's use of cow bone was not an entrepreneurial activity. There is no genuine issue of material fact that it did not occur in trade or commerce.

¶20 Michael also argued that Dr. Mosquera-Lacy's use of cow bone impacted the public interest. We disagree. The purpose of the CPA is to "protect the public." RCW 19.86.920. "[I]t is the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion that changes a factual pattern from a private dispute to one that affects the public interest." *Hangman Ridge*, 105 Wn.2d at 790. "[T]here must be shown a real and substan-

tial potential for repetition, as opposed to a hypothetical possibility of an isolated unfair or deceptive act's being repeated." *Eastlake Constr. Co. v. Hess*, 102 Wn.2d 30, 52, 686 P.2d 465 (1984).

¶21 A private plaintiff must show that his lawsuit would serve the public interest. *See Lightfoot v. MacDonald*, 86 Wn.2d 331, 544 P.2d 88 (1976). For private disputes, "it may be more difficult to show that the public has an interest in the subject matter." *Hangman Ridge*, 105 Wn.2d at 790. When a complaint involves a private dispute, such as here, the court evaluates four factors. *Id.* at 791. None of the factors are dispositive nor must all of the factors be present. *Id.* The factors are (1) whether the alleged acts were committed in the course of defendant's business; (2) whether the defendant advertised to the public in general; (3) whether the defendant actively solicited this particular plaintiff, indicating potential solicitation of others; (4) whether the plaintiff and defendant have unequal bargaining positions. *Id.*

¶22 Here, Bright Now was undeniably acting within the scope of its business. Bright Now offers dental care and periodontal services to the general public, and Bright Now provided periodontal services to Michael when her claim arose. However, there is no evidence Bright Now advertised to the public in general or that Bright Now actively solicited Michael in particular to be a patient. Michael could have chosen any dentist. After evaluating all four factors, we hold that Michael failed to show her lawsuit would serve the public interest. There is no likelihood or any real or substantial potential that other people will be injured in the same way Michael was injured.

## CONCLUSION

¶23 Bright Now did not act in trade or commerce nor did its actions impact the public interest. Therefore, we reverse

the Court of Appeals decision and affirm the trial court's summary judgment dismissing the CPA claim.

ALEXANDER, C.J., and C. JOHNSON, MADSEN, CHAMBERS, OWENS, FAIRHURST, and J.M. JOHNSON, JJ., concur.