# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

THOMAS OSTHELLER,                        )
                                         )        No. 68025-1-I
                        Appellant,       )
                                         )        DIVISION ONE
            v.                           )
                                         )
CITY OF BURLINGTON,                      )        UNPUBLISHED OPINION
                                         )
                        Respondent.      )        FILED: May 20, 2013

SPEARMAN, J. — Skagit County fired Thomas Ostheller from his job as a supervisor at the Burlington Senior Center after investigating his involvement in a confrontation at his workplace. During the course of the County's investigation, a City of Burlington employee who had responded to the incident incorrectly told County officials that Ostheller had had contact with a police officer after the incident and that the officer had told him to leave the Senior Center. This contradicted Ostheller's statement to County officials that he had left before the officer arrived. The County's termination letter identified Ostheller's violations of the County's Personnel Policies and Procedures Manual and referenced his failure to mention or admit to contact with law enforcement. Based in relevant part on the City employee's statements, Ostheller brought claims against the City for defamation and intentional interference with a business expectancy. He

appeals from the trial court's summary dismissal of his claims. We conclude both claims were properly dismissed and affirm.

## FACTS

In July 2005, Skagit County hired Thomas Ostheller to work as the senior services food service supervisor/senior nutrition project coordinator at the Burlington Senior Center. His duties included supervising central kitchen food production. Although the Senior Center was the property of the City of Burlington, the City paid the County to operate the Senior Center under an "Interlocal Agreement."

On November 5, 2008, City employee Simeon Brown and employees from Guardian Security arrived at the Senior Center to conduct fire alarm testing. Ostheller was working in the kitchen and Brown did not inform him of the testing. Ostheller became upset when the alarms were activated because he had not been given advance notice. Ostheller confronted Brown, pushed him in the chest, shouted at him, and called him a "dumb shit" or "stupid shit."[1] Clerk's Papers (CP) at 170. Brown reacted angrily and said he had told everyone who needed to be told about the testing.

Brown immediately notified the City's Parks and Recreation Director, Loren Cavanaugh, who came to the Senior Center. While Cavanaugh spoke with Brown, Ostheller attempted to approach Brown to apologize. Cavanaugh told Ostheller to leave the building and not to return unless cleared to do so. Ostheller

---

[1] Ostheller admits to yelling and using profanity but does not recall touching Brown.

2

left the premises. Cavanaugh contacted the Burlington Police Department and Sergeant Tom Moser responded. Ostheller was gone by the time Moser arrived.

Moser spoke with Brown and Cavanaugh. Cavanaugh said this was the second time in a year that Ostheller had assaulted an employee but that the previous employee had not wanted to press charges. Cavanaugh said it was clear Ostheller had an anger management problem and needed to be dealt with. Brown told Moser that he did not want to press charges against Ostheller. Cavanaugh, Ostheller, and Brown completed incident reports or written statements the day of the incident.

Cavanaugh informed Ostheller's supervisor, Jennifer Kingsley,[2] that Ostheller was no longer permitted at the Senior Center and would be trespassed if he came on the premises. Kingsley placed Ostheller on paid administrative leave pending an investigation by the County. Kingsley and the County's Human Resources Director, Billie Kadrmas conducted the investigation. They collected written witness statements and conducted interviews with witnesses. On December 15, Ostheller met with Kadrmas and provided his account of the events.

On January 5, 2009, Kingsley notified Ostheller by letter that the County intended to terminate his employment. Kingsley wrote that Ostheller's actions violated Section 12.2 of the Skagit County Personnel Policies and Procedures Manual ("the Manual"), that she no longer felt she could rely on him as an employee, and that his behavior was unacceptable. She wrote, "It is therefore my

---

[2] Kingsley was the director of senior services for the County.

conclusion that your services are no longer of value to the Senior Services Department or to the citizens of Skagit County." CP at 114. Kingsley informed Ostheller that a meeting had been scheduled for January 13 to allow him the opportunity to provide additional information and respond to the County's notice of preliminary intent before the County made a final decision.

After the notice of intent to terminate was mailed to Ostheller, the County received additional information from Mayor Edward Brunz. Brunz told Kadrmas and Holloran that he understood there had been previous problems with Ostheller and another City employee, that the employees were afraid to work around him, and that Brunz did not want him to return to the Senior Center.

Ostheller met with Kingsley and Kadrmas on January 13. During that meeting, Ostheller was asked whether he had had any direct contact with police after the incident. He truthfully related that he had not.

Kadrmas and Kingsley met with Cavanaugh on January 27. During their meeting they had the following exchange:

> [Kadrmas]: Is there anything else that is not in the report that you recall?
> [Cavanaugh]: Officer Tom Moser showed up while I was there.
> [Kadrmas]: Was there a report filed with the police?
> [Cavanaugh]: Officer Moser indicated that [I] could get the report from him, but since [Brown] was not going to press charges, there would be no report.
> [Kadrmas]: Then, no charges, no report.
> [Cavanaugh]: That's correct. Officer Moser told Mr. Ostheller that he no longer wanted him in the Community Center.
> [Kadrmas]: So, did [Ostheller] know there was an officer there?
> [Cavanaugh]: Yes, he was in uniform. Tom Ostheller walked in while Officer Moser was there and approached [Brown] right away and tried to apologize to [Brown]. I intervened and told [Ostheller] that while [Brown] appreciated the apology, he

4

needed to leave. Tom Ostheller started to become argumentative and then Officer Moser told him to leave the building.

CP at 275.

On February 10, 2009, Kingsley notified Ostheller by letter that the County had made a final decision to terminate his employment. The letter detailed his violations of the Manual.[3] Kingsley also wrote:

The misconduct outlined above was confirmed [after further investigation following the January 13 meeting], and additional information was provided regarding the role of law enforcement in the incident of November 5, 2008; information that you had contact with Officer Moser of the Burlington Police Department when in your previous interview you did not mention nor admit to any contact with law enforcement.

CP 61-62.

Ostheller filed a lawsuit against the City, asserting claims for defamation and intentional interference with a business expectancy. CP 358-68. The claims were based, in part, on Cavanaugh's statements about Ostheller's contact with

---

[3] Ostheller's violations were specified as:

Section 12.2 – Category 1 misconduct
  a. Violation of County policies, regulations and rules specified in this policy manual or otherwise promulgated.
  d. Poor public relations.
     Treating others disrespectfully.
     Being asked to leave City property due to the incident.
     Embarrassing the County and the Department as a result of your conduct.

Section 12.2 – Category 2 misconduct
  b. Offensive conduct or language toward a fellow employee, supervisor or citizen.
     Calling an employee of the City of Burlington a dumb shit.
     City of Burlington Police called on site due to report of assault and aggression.
  i. Conduct unbecoming a county employee on or off the job.
     Expulsion from a building owned by the City of Burlington.

CP at 60-62.

police.[4] The City admitted in its answer that Cavanaugh's statements to Kadrmas and Kingsley about Ostheller's contact with police were false.[5] Both parties filed motions for summary judgment. The trial court granted summary judgment in favor of the City and dismissed Ostheller's claims. Ostheller appeals.

## DISCUSSION

This court reviews summary judgments de novo. Michael v. Mosquera-Lacy, 165 Wn.2d 595, 601, 200 P.3d 695 (2009). The moving party bears the initial burden of showing the absence of an issue of material fact. Young v. Key Pharmaceuticals, Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989). If the moving party meets this burden, the inquiry shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. Id. at 225-26. Summary judgment is proper if, viewing the facts and reasonable inferences in the light most favorable to the nonmoving party, no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Michael, 165 Wn.2d at 601-02; CR 56(c). A summary judgment motion should be granted only if, from all the evidence, reasonable persons could reach but one

---

[4] Ostheller's complaint also alleged defamation and tortious interference based on other statements made by City employees during the course of the investigation. While the complaint does not specifically identify the statements on which Ostheller's claims are based, they appear to include statements by Brown (presumably his account of the incident) and Burlington mayor Edward Brunz (who indicated that Ostheller had engaged in similar behavior toward other employees in the past). Ostheller's briefing on appeal, however, focuses solely on the statements of Cavanaugh. Accordingly, we treat his defamation claim based on statements by individuals other than Cavanaugh as abandoned. See Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (assignment of error without supporting argument is waived); Washington Federal Savings & Loan Ass'n v. Alsager, 165 Wn. App. 10, 21, 266 P.3d 905 (2011), review denied, 173 Wn.2d 1025, 272 P.3d 851 (2012) (argument unsupported by argument and citation to legal authority need not be considered by court on appeal).

[5] Cavanaugh stated in a declaration that his statements to Kingsley and Kadrmas were a mistake based on his faulty memory and the passage of time.

conclusion. <u>Vallandigham v. Clover Park Sch. Dist. No. 400</u>, 154 Wn.2d 16, 26, 109 P.3d 805 (2005).

## Defamation

To establish a prima facie claim of defamation, a plaintiff must prove (1) a false and defamatory statement, (2) an unprivileged publication, (3) fault, and (4) damages. <u>LaMon v. City of Westport</u>, 44 Wn. App. 664, 667, 723 P.2d 470 (1986) (citing <u>Bender v. Seattle</u>, 99 Wn.2d 582, 599, 664 P.2d 492 (1983)).

Ostheller argues summary judgment on his defamation claim was improper because there were issues of fact as to whether Cavanaugh made the statements deliberately and whether the statements caused him to be fired. The City argues, among other things, that Ostheller cannot show that the statements caused him to be fired. We agree with the City.

In a defamation case, a plaintiff must show that the defendant's statement proximately and factually caused the plaintiff's damages. <u>Schmalenberg v. Tacoma News, Inc.</u>, 87 Wn. App. 579, 598-99, 943 P.2d 350 (1997). "'Cause in fact concerns 'but for' causation, events the act produced in a direct unbroken sequence which would not have resulted had the act not occurred.'" <u>Kim v. Budget Rent A Car Systems, Inc.</u>, 143 Wn.2d 190, 203, 15 P.3d 1283 (2001) (internal citation and quotation marks omitted). Cause in fact is generally a jury question but may be determined as a matter of law where reasonable minds could not differ. <u>Id.</u>

We conclude Ostheller cannot establish the existence of a genuine issue of material fact regarding whether he would have retained his job following the

incident, but for Cavanaugh's statement about police contact. The County had made a preliminary decision to terminate Ostheller's employment, as stated in the pre-termination letter issued before the statements by Cavanaugh. In the letter, Kingsley stated that she could no longer rely on Ostheller due to his work-related conduct. Furthermore, the County had information that the incident with Brown was not Ostheller's first confrontation with a City employee. The City informed the County that based on Ostheller's behavior during the confrontation with Brown and safety concerns for City employees, Ostheller would not be allowed to return to the Senior Center. In addition, the grounds for termination that are identified in the termination letter are identical to the grounds identified in the pre-termination letter and are based on the incident.[6]

Ostheller argues that the termination letter's reference to the conflict between his statement and Cavanaugh's is evidence that Cavanaugh's statements polluted the review process and prevented a different outcome.[7] But even if Cavanaugh had not made the statements at issue, Ostheller points to no information made available to the County subsequent to the pre-termination

---

[6] While one of the grounds is identified as Ostheller's being asked to leave the Senior Center, the letter does not impute any significance to which party it was who asked him to leave (i.e., Cavanaugh or Moser).

[7] Ostheller asserts in his brief to this court that "it would appear if Ostheller 'admitted' or otherwise 'mentioned' during his meeting with Kingsley and Kadrmas that he did have contact with the police, a case may have been made for some other result than termination. If he lied he may have kept his job; he was doomed by telling the truth." App. Brief at 21. But he cites to nothing in the record to support this assertion.

letter, from him or any other source, that was likely to have caused it to alter its preliminary decision to terminate his employment.[8]

### Intentional Interference with Business Expectancy

For an interference with business expectancy claim, a plaintiff must show (1) a valid contractual relationship or business expectancy; (2) the defendant had knowledge of that relationship or expectancy; (3) the defendant engaged in intentional interference resulting in a breach or termination of the relationship or expectancy; (4) the defendant interfered for an improper purpose or used improper means; and (5) the plaintiff suffered resulting damages. Woody v. Stapp, 146 Wn. App. 16, 23, 189 P.3d 807 (2008); Commodore v. Univ. Mech. Contractors, Inc., 120 Wn.2d 120, 137, 839 P.2d 314 (1992).

Ostheller argues that his tortious interference claim was improperly dismissed because (1) he had a reasonable business expectancy in a system of progressive discipline, as contained in the County's personnel policies; (2) the City (vis-à-vis Cavanaugh) was aware of this business expectancy; (3) Cavanaugh intentionally made the statements to contaminate the disciplinary process and cause the County to terminate Ostheller; and (4) as a result, he lost his job. The City argues that he cannot establish a legitimate expectancy in a system of progressive discipline, citing the Manual and Woody.

We conclude the trial court properly dismissed Ostheller's tortious interference claim. The Manual clearly states that it does not constitute a contract

---

[8] Indeed, in the record before us, other than Cavanaugh's statement, the only new information received by the County after it sent the notice of intent to terminate was from Brunz and was unfavorable to Ostheller. Ostheller does not argue that this information would have resulted in a different, more favorable outcome.

or make any promises of specific treatment. The "Introductory Information" section states:

> COUNTY POLICIES AND PROCEDURES INCLUDED IN THIS MANUAL DO NOT CONSTITUTE A CONTRACT WITH EMPLOYEES, nor do they promise continued employment. The County reserves legal right to recruit, select, direct, discipline and discharge employees and exercise full discretion over the organization's policies, procedures and performance of work.

CP at 83. The "Statement of Purpose" section also provides, "It is not the intent of this manual to establish promises of specific treatment." CP at 84. Moreover, the "Employee Conduct and Discipline" section states "[w]hile the County will strive to take necessary corrective action in a fair and consistent manner, the County must reserve full discretion to make any and all disciplinary decisions which it determines are necessary . . . ." CP at 87. Given these statements in the Manual, Ostheller fails to show that he had a valid business expectancy in a system of progressive discipline.[9]

To the extent Ostheller's claim is based on an expectation of continued employment, Woody is instructive.[10] There, an at-will employee sued his coworkers for tortious interference for making statements to their employer in the course of an investigation into his alleged inappropriate conduct. Woody, 146

---

[9] Ostheller cites Thompson v. St. Regis Paper, 102 Wn.2d 219, 685 P.2d 1081 (1984) for the proposition that the expectation of some form of fair treatment has been recognized in Washington cases. Thompson, however, was a wrongful discharge case brought against an employer, and Ostheller did not bring a wrongful discharge claim against the County. To the extent he claims the County failed to follow its own disciplinary policies and procedures, such argument is unavailing because the County is not a party to this case.

[10] Though Ostheller does not overtly claim he had a business expectancy in continued employment, his claimed damages are the loss of his job and benefits; he does not claim he would have suffered damages had he not been terminated. Therefore, it is apparent that his claim for tortious interference assumes his having had a business expectation in continued employment.

Wn. App. at 18. Affirming the trial court's dismissal of the claim on summary judgment, this court stated, "Generally, at-will employees do not have a business expectancy in continued employment." Id. at 24. Therefore, "[c]onsidering [the plaintiff's] at-will status, he fails to establish either causation for his discharge or any damages flowing from his discharge." Id. Ostheller was an at-will employee, not a party to an employment contract, and likewise cannot establish causation or damages from his termination. Furthermore, as noted, the Manual states that the County's policies and procedures as contained therein did not "promise continued employment." CP at 83.

Affirmed.

WE CONCUR: