IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| ELVIRA WILLIAMS, | ) | No. 68110-9-I |
| Appellant, | ) ) | |
| | ) | DIVISION ONE |
| v. | ) ) | |
| | ) | |
| LIFESTYLE LIFT HOLDINGS, INC., a foreign corporation d/b/a LIFESTYLE LIFT, | ) ) ) | |
| | ) | |
| Defendant, | ) | PUBLISHED OPINION |
| | ) | |
| SCIENTIFIC IMAGE CENTER MANAGEMENT, INC., a foreign corporation d/b/a LIFESTYLE LIFT; SEATTLE PLASTIC SURGERY ASSOCIATES, P.C., a domestic corporation; | ) ) ) ) ) ) ) | FILED: May 28, 2013 |
| | ) | |
| Respondents. | ) ) | |

COURT OF APPEALS DIV I
STATE OF WASHINGTON
2013 MAY 28 AM 8: 51
FILED

BECKER, J. — The plaintiff in this action purchased a cosmetic surgery procedure known as the Lifestyle Lift after seeing it advertised on television as relatively quick and painless, unlike traditional cosmetic surgery. The procedure turned out to be much different than advertised. Where the marketing of a surgical procedure is deceptive and entrepreneurial, a jury may be permitted to find that the cost of the procedure is a consumer injury even if the plaintiff has alleged that the same procedure caused personal injury. We reverse summary

judgment dismissal and reinstate the plaintiff's claim under Washington's Consumer Protection Act, chapter 19.86 RCW.

We review summary judgment de novo. Michael v. Mosquera-Lacy, 165 Wn.2d 595, 601, 200 P.3d 695 (2009). Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Michael, 165 Wn.2d at 601. When determining whether an issue of material fact exists, the court construes all facts and inferences in favor of the nonmoving party. Michael, 165 Wn.2d at 601.

There are two respondents in this appeal. One is Scientific Image Center Management, Inc. Scientific Image does not provide medical services. It is the exclusive licensee of the trademark "Lifestyle Lift," which is owned by Lifestyle Lift Holding, Inc., a Delaware corporation. Scientific Image sublicenses use of the Lifestyle Lift trade name to medical centers that perform procedures advertised under that name. Scientific Image provides management, financial, and legal services to the Lifestyle Lift centers. The services include management of a call center, as well as marketing, advertising, and promotions. As of 2009, there were 32 Lifestyle Lift centers located in 19 states.

The second respondent, Seattle Plastic Surgery Associates, P.C, is one of the centers served by Scientific Image. Opened in 2006, Seattle Plastic does business as "Lifestyle Lift Seattle." Seattle Plastic employed Dr. David Q. Santos, the surgeon who performed a "Lifestyle Lift" upon Williams. As part of its contract with Seattle Plastic, Scientific Image receives 85 percent of

all patient fees. These revenues go to pay the rent, advertising, staff and other management functions Scientific Image provides to Seattle Plastic. The physicians employed by Seattle Plastic receive the other 15 percent.

Appellant Elvira Williams is a 64-year-old certified nurse's assistant. In early 2007, Williams was looking at pictures taken at her anniversary on New Year's Eve and did not like that her face looked "droopy." She saw a television commercial about the Lifestyle Lift. She called the 1-800 number advertised and received a brochure in the mail.

The brochure claimed the Lifestyle Lift was "a minor one-hour procedure with major results." The procedure was "exclusively designed to improve jowls, frown lines, wrinkles, and loose neck (turkey neck) and facial skin" and "requires no dangerous general anesthetic." The procedure was said to produce "Immediate same day results with Minimal bruising or swelling." Patients could "Return to work quickly vs. traditional procedures."

In reality, the Lifestyle Lift is a traditional cosmetic surgery procedure. Kenneth Zorn, general counsel for Scientific Image, testified in a CR 30(b)(6) deposition as the representative for Seattle Plastic that what distinguishes the Lifestyle Lift is its business model:

> What is revolutionary about the Lifestyle Lift is its business model and the ability to market a safe, affordable facial plastic surgery to the general public. It's the revolutionary business model that is the important thing. The procedure is something that medical folks have known about for years. They just don't do it because they don't want to make any – they feel they can make more money offering traditional plastic surgery.

3

The brochure Williams received was part of a marketing program developed by Scientific Image. Seattle Plastic was told that Scientific Image's marketing of Lifestyle Lift "has proven effective in generating sales in cosmetic surgical facial rejuvenation products and services." Lifestyle Lift advertising is designed to attract customers who are wary of traditional cosmetic surgery, thinking it too invasive and painful. A letter sent to Lifestyle Lift physicians tells them, "Remember, most patients come to the Lifestyle Lift to avoid all that is involved in a full facelift (anesthesia, recovery, pain, swelling, loss of work, price, etc.)."

Along with the brochure, Williams received a phone number for Seattle Plastic. Williams called and made an appointment for a consultation at the convention center in Seattle on March 3, 2007.

Physicians in Lifestyle Lift centers are told that when meeting with "patient prospects," they "must use only approved Lifestyle Lift pre and post op forms and literature. The use of any unauthorized forms or literature is prohibited." When Williams and her husband arrived for the consultation, they were shown a video featuring "before" and "after" pictures of women who had reportedly undergone the Lifestyle Lift. The video repeated the claims made on the television commercial: the Lifestyle Lift was a simple procedure like going to the dentist, and it would "take 20 years off your face." Dr. Santos came into the room after the video ended, put Williams in front of a mirror, and showed her where he would get rid of the "goose neck" and where he would put a "little incision" to

4

suction out fatty material before pulling the skin back.

Scientific Image has developed training materials for "physician consultants" who meet with the prospective patients. The consultants are taught to "Close and Create Urgency." One technique is to pretend there are only a few openings available in the time frame desired by the prospective patient, and to say the schedule is completely full for several months after that. Patients are to receive a follow-up call within 48 hours of being signed up, to be reassured about "how good they are going to look and feel."

On March 3, the day of her consultation, Williams signed a surgery agreement for a Lifestyle Lift for $4,000 and an add-on procedure of chin liposuction for $600. She paid a 10 percent deposit of $460 and applied for financing for the balance, though the record indicates she decided to pay off the entire amount to avoid interest. According to Lifestyle Lift's refund policy, Williams had seven days from the date she signed the surgery agreement to ask for a refund in writing. Her surgery was scheduled for two weeks later, on March 17, 2007.

The surgery agreement that Williams signed on March 3 included a one-page form entitled "Understanding the Lifestyle Lift Procedure." The form advised her the result of the procedure was not guaranteed and her recovery might vary from the experience of patients depicted in the advertising:

> The Lifestyle Lift® is a surgical procedure. Some people may need extra healing time and may not be able to return to work or normal activities for an extended period of time.
> . . . .
> Whenever the skin is cut it heals with a scar. You will have a scar.

Although Lifestyle Lift doctors take maximum efforts to achieve satisfactory wound healing after the Lifestyle Lift surgery, abnormal scars may occur. . . . Your earlobes may be pulled or stretched after surgery. In a small number of cases, motor and sensory nerves may be injured during the surgery.

Normal symptoms during the recovery period: swelling and bruising; discomfort and some pain; itching; and redness.

. . . .

Surgery is not an exact science. While your doctor will attempt to give you optimal results, individual results will vary. Having a realistic expectation is important. You may need an additional procedure should your doctor decide it is necessary.

. . . .

I ALSO UNDERSTAND THAT MY RESULTS AND RECOVERY WILL VARY AND MAY NOT BE SIMILAR TO THE RESULTS AND RECOVERY OF THAT OF OTHER PATIENTS INCLUDING THOSE DEPICTED IN THE LIFESTYLE LIFT ADVERTISING.

I AM AWARE THAT THE PRACTICE OF MEDICINE IS NOT AN EXACT SCIENCE AND ACKNOWLEDGE THAT NO GUARANTEES OR PROMISES HAVE BEEN MADE TO ME ABOUT THE RESULTS OF THE PROCEDURE.

(Emphasis in original.)

Williams had a half-hour preoperative visit at Seattle Plastic. On March 17, the day of the surgery, Williams was taken into the office operating room. She was given a sedative. About 20 minutes later, just before the operation began, she signed a four-page form entitled "Informed Consent: Lifestyle Lift." She signed a similar form for the add-on "Aspiration Lipectomy." The forms describe each procedure and list the risks.

Dr. Santos came in and performed the surgery. Williams recalls waking up four hours later with her face wrapped in bandages. Her next memory is of waking up that night in bad pain. Williams returned to Seattle Plastic four times

6

in the following week to have fluid buildup aspirated from her face. When the bandages came off, her face "looked like a blowfish" and was black and blue. A week after the surgery, when Williams complained of intense pain behind her ear, a different doctor at Seattle Plastic gave her a cortisone shot that was so painful "it almost made me pass out." The pain subsided, but Williams continued to experience swelling, and she developed a lump on her right cheek. Williams did not go back to Seattle Plastic. She underwent a second surgery with a different physician to correct the problems. She ended up with numbness in one cheek and deformed earlobes. The risk that these conditions might result from Lifestyle Lift surgery was specifically mentioned in the consent forms she signed before the surgery.

In March 2010, Williams sued Dr. Santos, Seattle Plastic, Scientific Image, and Lifestyle Lift Holding. She alleged negligence, failure to obtain informed consent, and violation of the Consumer Protection Act. In addition to damages for pain and suffering, she claimed about $22,000 in economic damages for medical costs, lost wages, and incidental expenses. The economic damages included the $4,600 she paid for the Lifestyle Lift and liposuction.

Lifestyle Lift Holding was dismissed by stipulation. Scientific Image obtained dismissal from the claims of negligence and lack of informed consent on the grounds that it did not employ Dr. Santos or anyone else involved in Williams' care, and it was not a "health care provider" under RCW 7.70.020. In November 2011, the trial court entered an order on summary judgment, dismissing the

7

consumer protection claim against all defendants.

Williams went to trial in December 2011 against Dr. Santos and his employer, Seattle Plastic. The trial resulted in a defense verdict. The jury found that Dr. Santos and Seattle Plastic did not fail to obtain informed consent from Williams and they were not negligent.

Williams appeals only the dismissal of her claims against Scientific Image and Seattle Plastic under the Consumer Protection Act.

INJURY

Anyone who has been "injured in his or her business or property" by a violation of Washington's Consumer Protection Act may bring a civil action and may recover actual damages, treble damages in the court's discretion, trial costs, and attorney fees. The Act is to be "liberally construed that its beneficial purposes may be served." RCW 19.86.920.

To state a prima facie claim under the Act, a plaintiff must establish five distinct elements: (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) public interest impact, (4) injury to the plaintiff in his or her business or property, and (5) causation. Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 780, 719 P.2d 531 (1986). For purposes of summary judgment, Scientific Image and Seattle Plastic asked the trial court to assume that their advertising was unfair or deceptive and involved the entrepreneurial aspects of medicine. They challenged Williams' proof only as to the injury element.

8

Personal injuries are not recoverable under the Act. Ambach v. French, 167 Wn.2d 167, 173, 216 P.3d 405 (2009). Williams claims the $4,600 cost of the surgery as a consumer injury. Respondents contend that as a matter of law under Ambach, payment for a surgery cannot satisfy the element of "injury to business or property."

In Ambach, the plaintiff underwent shoulder surgery that turned out badly. She sued the physician and hospital for professional negligence. She also alleged they violated the Consumer Protection Act, claiming that they performed a surgery that was unnecessary because of their financial incentive to provide a high volume of services. Ambach, 167 Wn.2d at 178 n.5. Our Supreme Court held she had not established the element of injury to business or property as distinct from a personal injury. The damages she claimed were medical expenses, wage loss, loss of earning capacity, and out-of-pocket expenses. Ambach, 167 Wn.2d at 174. Because these are damages that arise out of personal injury, they are not evidence of a consumer injury:

> While Ambach's payment for her surgery may look on its face like the purchase of a good or service envisioned by the CPA, her actual damages demonstrate that what she really seeks is redress for her personal injuries, not injury to her business or property. We hold that because Ambach's purported CPA injury is payment for a surgery from which personal injury also arose, she has failed to state a prima facie CPA claim.

Ambach, 167 Wn.2d at 178-79 (footnote omitted).

Here, the trial court was persuaded that Williams, like the plaintiff in Ambach, was disguising her personal injury claim to look like a claim under the

Consumer Protection Act. The court dismissed the claim because the only damage Williams was claiming was "payment for surgery from which personal injury arose, just like Ambach."

Bringing a personal injury claim for damages arising from a professional service does not categorically exclude a plaintiff from bringing a Consumer Protection Act claim arising from the same service. Quimby v. Fine, 45 Wn. App. 175, 180, 724 P.2d 403 (1986), review denied, 107 Wn.2d 1032 (1987). A claim of malpractice cannot be brought under the Consumer Protection Act because it relates to the competence of the professional. But an informed consent claim can be within the scope of the Consumer Protection Act if it relates to entrepreneurial aspects of medical practice. Quimby, 45 Wn. App. at 180-81; see also Young v. Savidge, 155 Wn. App. 806, 230 P.3d 222 (2010). In Young, a patient sued her dentist for violation of the Consumer Protection Act for installing a crown made out of nickel chromium, rather than the "high noble" metals of gold, platinum, or palladium that he recommended, his webpage listed, and he later billed for. Young, 155 Wn. App. at 812-13. The patient's claims of informed consent and breach of contract were dismissed as time-barred, but the Consumer Protection Act claim was allowed to go forward.

In Ambach, the Supreme Court's overriding concern was that the Consumer Protection Act not be used to give plaintiffs "backdoor access to compensation they were denied in their personal injury suits." Ambach, 167 Wn.2d at 179 n.6. As stated in Justice Chambers' concurring opinion, the Act

10

holds doctors and other learned professionals "clearly answerable for false or deceptive acts in the entrepreneurial aspects of their practice." Ambach, 167 Wn.2d at 179 (Chambers, J., concurring), citing Wright v. Jeckle, 104 Wn. App. 478, 484-85, 16 P.3d 1268, review denied, 144 Wn.2d 1011 (2001). Wright upheld a Consumer Protection Act claim based on the "advertising, marketing, and sales" of the fen-phen diet drugs. Wright, 104 Wn. App. at 480. "Reduced to its essence, the plaintiffs' argument here is that Dr. Jeckle was not practicing medicine. He was in the business of selling diet drugs." Wright, 104 Wn. App. at 485.

Similarly reduced to its essence, Williams' claim under the Consumer Protection Act is that Scientific Image and Seattle Plastic were not practicing medicine, they were in the business of selling surgeries. Scientific Image, it must be remembered, is not a health care provider and therefore not subject to a claim of medical malpractice. Scientific Image and its licensee, Seattle Plastic, used mass-market advertising, solicitation, and high-pressure sales techniques to promote the "Lifestyle Lift" like any other consumer product. Williams' claim that they engaged in a "bait and switch" involves the entrepreneurial aspect of medicine, not the skill and competence of the medical practitioner. Williams claims she would not have given her money to Lifestyle Lift "but for their advertising and marketing that claimed the surgery to be minimally invasive and not a 'traditional' facelift."

In Ambach, the court was guided by its previous decision in Michael,

11

involving a dental patient's claim that it was deceptive to use cow bone for a grafting procedure when she had specifically requested that no animal products be used. The Consumer Protection Act claim in Michael failed because there was no showing that the use of cow bone was entrepreneurial, occurred in trade or commerce, or impacted the public interest. Michael, 165 Wn.2d at 602-05. The court saw the Ambach case as analogous in that it related to the doctor's judgment and treatment of a patient, and the claimant did not submit evidence that the injurious procedure was advertised to the public.

> Though Ambach's case is before us only on the issue of whether her injury is to "business or property," the structure of her CPA claim is similar to Michael's. She also fails to allege that Dr. French actively solicited her as a patient or advertised shoulder surgeries to the general public. The individual Hangman Ridge factors should not be read in isolation so as to render absurd conclusions.

Ambach, 167 Wn.2d at 178 (footnote omitted).

Here, it is true Williams brought a personal injury claim relating to her treatment by Dr. Santos and his employer, Seattle Plastic. Like in Ambach, the personal injury claim was rejected by a jury. But unlike in Ambach, Williams was not claiming to be "physically and economically injured by one act." Ambach, 167 Wn.2d at 174. The act that caused the alleged personal injury to Williams was the surgery; the acts that caused her alleged consumer injury were the advertising and sales techniques. Williams' Consumer Protection Act claim does not depend on proof that she sustained a personal injury as a result of the surgery. It depends on proof that the surgery was deceptively marketed, like a

used car advertised as being new. That distinguishes <u>Ambach</u>. As the Supreme Court stated, "Ambach's failure to state a cognizable CPA claim is not just that she attempts to disguise her personal injuries as sounding in business or property, but also that she fails to allege the truly public nature of Dr. French's action." <u>Ambach</u>, 167 Wn.2d at 177-78.

The Supreme Court also said that the individual <u>Hangman Ridge</u> factors "should not be read in isolation so as to render absurd conclusions." <u>Ambach</u>, 167 Wn.2d at 178. Heeding that remark, we consider the context of the court's statement that an injury under the Act cannot be "payment for a surgery from which personal injury also arose." <u>Ambach</u>, 167 Wn.2d at 179. The defendants in <u>Ambach</u>, a doctor and a hospital, were not marketing shoulder surgery to the public at large with claims of an untraditional procedure that would allow patients to return to work quickly. They were not pressuring prospective patients with spurious tales of long waiting lists. They were not making phone calls reassuring patients about how great they were going to feel after having surgery.

The plaintiff in <u>Ambach</u> claimed that the cost of surgery versus the cost of more conservative treatment was a consumer injury. <u>Ambach</u>, 167 Wn.2d at 177. The court held that this claim went to the competence of the medical professionals' choice of treatment for a problem brought to them by the patient. <u>Ambach</u>, 167 Wn.2d at 179 n.5. Williams, on the other hand, is not challenging the professional decisions made by Dr. Santos or Seattle Plastic during the course of her treatment.

13

We conclude Williams has stated a prima facie claim under the Consumer Protection Act against the business entities responsible for the marketing of the Lifestyle Lift. A jury could conclude that their deceptive business strategy caused Williams to purchase a Lifestyle Lift. A jury could further conclude that the cost of Williams' surgery was an injury to her business or property and that she is entitled to a refund, even if the surgery was competently performed and she was fully advised beforehand of the physical risks.

## COLLATERAL ESTOPPEL

Scientific Image and Seattle Plastic also argue that even if the court erred by preventing Williams from presenting her Consumer Protection Act claim to the jury, she is now collaterally estopped from claiming that she was misled by false advertising because the jury rejected her informed consent claim. This argument fails. Collateral estoppel requires an identical issue. State Farm Mut. Auto. Ins. Co. v. Avery, 114 Wn. App. 299, 304, 57 P.3d 300 (2002). The issue under the Consumer Protection Act is whether deceptive marketing caused Williams to purchase a surgical procedure that she otherwise would have avoided. The issue under an informed consent theory is whether Williams received accurate information about the physical risks before submitting to the surgery.

The distinction is persuasively illustrated in a decision by New York's highest court, Karlin v. IVF America, Inc., 93 N.Y.2d 282, 712 N.E.2d 662 (1999). In Karlin, the plaintiffs sued the operators of an in vitro fertilization program, alleging deceptive practices and false advertising under a consumer protection

14

statute. The operators of the program prevailed in the lower courts. They argued that the plaintiffs' claims were "governed exclusively by New York's informed consent statute." Karlin, 712 N.E.2d at 666. The high court reversed and held that the consumer claim stood on its own feet. The fact that a person may have a claim for lack of informed consent "does not preclude a separate claim on the ground that deceptive acts or misleading advertising lured the person to the doctor's office in the first place." Karlin, 712 N.E.2d at 667. The court reasoned that the interests at stake in a consumer claim are "distinctly different" from those in a suit for professional malpractice. Karlin, 712 N.E.2d at 668. A physician's treatment of an individual patient typically does not have an impact on the public at large, but when physicians "choose to reach out to the consuming public at large in order to promote business—like clothing retailers, automobile dealers and wedding singers who engage in such conduct—they subject themselves to the standards of an honest marketplace." Karlin, 712 N.E.2d at 668. With its explanation that the public interest impact is the key to distinguishing malpractice from a consumer claim, Karlin is consistent with Ambach.

The evidence indicates that Scientific Image and Seattle Plastic brought Williams into the office and sold her on the Lifestyle Lift by means of a long course of materially misleading conduct, from the initial television commercial, to the mailed promotional materials, to the video shown at the first consultation, to the sales strategies employed by the "physician consultants." That Williams

15

afterwards received accurate information about the physical risks of the procedure does not estop her from suing under the Consumer Protection Act for the cost of her surgery.

If Williams prevails in the trial court on remand, her attorney fees incurred in this appeal shall be included in the award of attorney fees. RCW 19.86.090.

Reversed.

Becker, J.

WE CONCUR:

Appelwick, J.

Cox, J.