**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| NASRA ELMI and ROBERT BLANTON, husband and wife, | No. 85851-3-I |
| Respondents, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| AESTHETIC REJUVENATION SPA, PLLC, a Washington professional limited liability company; and KRISTINE BRECHT, M.D., individually, | |
| Appellants. | |

MANN, J. — Aesthetic Rejuvenation Spa (ARS) and Dr. Kristine Brecht (collectively Dr. Brecht) appeal a jury verdict in favor of Nasra Elmi and her husband Robert Blanton on claims arising from cosmetic surgical procedures performed by Dr. Brecht on Elmi. Dr. Brecht argues the trial court erred by (1) admitting certain evidence under ER 404(b), (2) denying her motion for a mistrial, (3) denying her motion for a new trial, and (4) denying her motion for judgment as a matter of law. We affirm.

I

A

Dr. Brecht was a licensed physician and surgeon who was board certified in family medicine. She was the sole owner and operator of ARS located in Burien,

Washington. Dr. Brecht performed both surgical and nonsurgical procedures at ARS. Staff at ARS included a receptionist and medical assistants.

Elmi was interested in getting cosmetic surgery and found Dr. Brecht on YouTube. Dr. Brecht talked about cosmetic surgical procedures she performs including arm lifts and tummy tucks. Elmi viewed photos on the ARS website of arms and stomachs showing small incisions. On August 1, 2020, Elmi saw Dr. Brecht for a consult to discuss getting a tummy tuck, liposuction, arm lift, and breast lift. During the consult, Elmi disclosed her diabetes and that she was a smoker. Elmi also signed consent forms.

Dr. Brecht performed two surgeries on Elmi with the aid of two medical assistants, Jackeline Lopez and Maria Arce. Dr. Brecht performed an abdominoplasty and liposuction on Elmi on September 1, 2020. Dr. Brecht performed an arm lift, breast lift, and liposuction on Elmi one week later on September 8. For both surgeries, Dr. Brecht used local anesthesia and oral sedation rather than general anesthesia. Elmi was instructed to take Ambien, oxycodone, Phenergan, and lorazepam prior to surgery and then during surgery she was given more oxycodone and lorazepam. Dr. Brecht did not establish intravenous access to Elmi during the surgeries.

The incisions from the surgeries did not heal properly and kept opening. The incision on Elmi's left arm ran from her armpit to her elbow and opened twice in several places. After several follow up appointments, Dr. Brecht determined Elmi had an infection. Elmi eventually stopped seeking treatment from Dr. Brecht. The surgeries and resulting scars and wounds required Elmi to seek ongoing treatment elsewhere.

B

Unrelated to her treatment of Elmi, on August 4, 2021, Dr. Brecht entered a stipulated order with the Washington Medical Commission (WMC). Dr. Brecht agreed in the order that she committed unprofessional conduct under RCW 18.130.180(4) related to the treatment of nine patients.

Also unrelated to her treatment of Elmi, on October 22, 2021, Dr. Brecht entered a stipulated order with the Department of Health (DOH) where she agreed that between October 2019 and January 2020 she performed cosmetic surgical procedures such as liposuction and arm lifts, and operated an ambulatory surgical facility without a license. As a result, Dr. Brecht was restricted from performing any procedures that required sedation and was prohibited from operating as an ambulatory surgical facility.

C

Elmi sued Dr. Brecht for medical negligence, lack of informed consent, breach of promise, and violation of the Consumer Protection Act (CPA), ch. 19.86 RCW. Blanton also claimed future loss of consortium. Elmi sought damages, costs and treble damages under the CPA, attorney fees, and interest.

Dr. Brecht moved in limine to exclude evidence of or reference to the disciplinary proceedings before the WMC and the DOH as irrelevant to proving breach of the standard of care, as improper character evidence, and as cumulative evidence that would confuse the jury and be unfairly prejudicial. The trial court denied the motion to exclude the DOH order; the parties agreed to a redacted version of the order which was admitted as exhibit 260. The trial court also denied the motion to exclude the WMC order and determined it was admissible under ER 404(b) and relevant to the standard of

care and Dr. Brecht's way of treating patients. The parties agreed to a redacted version of the WMC order which was admitted as exhibit 261.

Dr. Brecht moved to exclude the standard of care testimony by Elmi's expert, board certified anesthesiologist, Dr. Harold Brandford. The trial court denied Dr. Brecht's motion as it related to the postsurgery standard of care. The court granted the motion as to care during surgery and invited Elmi to make an offer of proof for presurgery standard of care. Following cross-examination of Dr. Brandford, Elmi conceded there was no injury incurred as a result of Dr. Brecht's sedation method and so Dr. Brandford's testimony on the standard of care during surgery was irrelevant. The trial court instructed the jury as follows, "you have heard testimony from Dr. Brandford regarding violations of the standard of care. You are to disregard any testimony from Dr. Brandford as it relates to standard of care and/or proximate cause related to Dr. Brecht's sedation practices or methods of anesthesia."

Dr. Brecht also moved to exclude all expert testimony on material facts, including risks from diabetes, smoking, and scarring, that Elmi was not informed of prior to consenting to surgery. The trial court denied the motion.

Dr. Brecht testified consistent with a general denial. She confirmed that she was the decisionmaker for ARS marketing and used a process to get patients to agree to surgery that began with advertising.

Elmi introduced testimony from Stephanie Kodis-Fisher, a former patient of Dr. Brecht, who had a similar surgery to Elmi. The trial court determined that the testimony of Kodis-Fisher was limited to oral statements by Dr. Brecht while going through consent forms. But Elmi's counsel asked Kodis-Fisher about her scars and Dr. Brecht

objected before Kodis-Fisher answered. The trial court instructed the jury that statements and questions of counsel are not evidence.

Elmi testified that when she found Dr. Brecht online she did not see many reviews for surgeries. She testified that at her first visit to ARS, Dr. Brecht presented herself as "the best" with the "best technology" and that she teaches people surgery. Elmi testified that Dr. Brecht "didn't say much" about smoking or diabetes and took her in like a "perfect candidate" for the surgery. Elmi testified that Dr. Brecht told her the scar from her tummy tuck would be thin and the she wouldn't even notice it. Elmi testified that Dr. Brecht said it was safe to get multiple surgeries a week apart because it was the best way to heal all at once and that it was safe. Dr. Brecht told Elmi that the healing process would take about two weeks.

Elmi described going to her first surgery and arriving at ARS, but otherwise could not remember what happened. Elmi said she had no memory after the surgery until four or five days later. Elmi described arriving at ARS for her second surgery and that she was taken to a room and given medication after which she was told to sign a form. Elmi testified that in postsurgery follow-up appointments, Dr. Brecht said she was doing "amazing, beautiful, everything looking good." Elmi described Dr. Brecht using tape on her wounds that would strip her skin off at each appointment.

Elmi testified that after the second surgery she began to smell "funny" and that when she told Dr. Brecht her concerns, Dr. Brecht did not test her for infection. Elmi said that eventually, after Blanton insisted, she was tested for infection and that test came back positive. Elmi testified that since the surgeries she cannot wear short sleeve clothing and that she hates how she looks.

Blanton testified that he did not remember Dr. Brecht disclosing the risks of surgery. He testified that Dr. Brecht did not discuss the additional risks of smoking and diabetes. Blanton also testified that he did not witness Elmi sign consent forms.

The jury also heard from several experts including board certified cosmetic surgeon Dr. Elmer Mangubat and board certified plastic surgeons Dr. Paul Luu, Dr. Mark Mandell-Brown, and Dr. Adam Rubinstein.

D

On July 24, 2023, Dr. Brecht moved for mistrial under CR 59 asserting that Elmi's counsel violated the trial court's rulings on motions in limine for the WMC order exhibit 261, and Kodis-Fisher's testimony. She also argued the admission of Dr. Brandford's testimony regarding the standard of care and anesthesia warranted a mistrial. The trial court denied the motion.

On July 27, 2023, Dr. Brecht moved for judgment as a matter of law under CR 50 on the CPA claim. Dr. Brecht also moved for partial directed verdict under CR 50 on the CPA claim, the medical negligence claim, and the breach of promise claim.

On August 3, 2023, the case was submitted to the jury and the trial court addressed the pending motions:

> The defense has made their record for their motions, but I see no benefit to my removing any of the claims that are in front of the jurors at this stage because, if I'm wrong, the Court of Appeals says I was wrong to do so, then the whole case would have to be retried, especially at least as to that claim, and that to me seems like a horrible waste of resources for the parties. What's the difference between ruling now versus ruling after the jurors have reached a verdict and potentially setting aside that verdict, if I agreed with defense's position? So I'm denying those motions without prejudice at this time, and they can be renewed as the rules allow following entry of the verdict.

On August 4, 2023, the jury found in favor of Elmi on all claims.  The jury awarded $11,000,000 to Elmi for past and future damages and $2,000,000 to Blanton for loss of consortium.  The jury also determined the financial loss under the CPA to be $34,186.  On August 23, 2023, the trial court entered judgment in the amount of $13,034,186.

On September 1, 2023, Dr. Brecht moved for a new trial under CR 59(a) on 16 grounds including the violations of motions in limine, denial of motions for mistrial, and denial of motions for directed verdict.  Following a hearing, the trial court denied the motions based on a lack of evidence and insufficient argument.

On September 25, 2023, the trial court entered findings of fact and conclusions of law awarding fees and treble damages and entered a supplemental judgment in the amount of $79,000 in attorney fees and $25,000 in treble damages.

Dr. Brecht appeals.

II

Dr. Brecht argues the trial court abused its discretion by improperly admitting evidence of prior conduct under ER 404(b).  Specifically, she assigns error to the admission of exhibit 261, the language of RCW 18.130.180(4), and WMC representative Kyle Karinen's deposition testimony as evidence of Dr. Brecht's practice and the standard of care.  She also assigns error to Kodis-Fisher's testimony related to the consent forms.  We disagree.

We review a trial court's decision to admit evidence under ER 404(b) for abuse of discretion. Doe v. Corp. of President of Church of Jesus Christ of Latter-Day Saints, 141 Wn. App. 407, 167 P.3d 1193 (2007) (citing State v. Lough, 125 Wn.2d 847, 864-

65, 889 P.2d 487 (1995)). "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997). "A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard." Littlefield, 133 Wn.2d at 47. "If the trial court's ruling is based on an erroneous view of the law or involves application of an incorrect legal analysis it necessarily abuses its discretion." Dix v. ICT Grp, Inc., 160 Wn.2d 826, 833, 161 P.3d 1016 (2007).

A

The trial court determined that exhibit 261 would be redacted to include only the four surgical patients who underwent procedures similar to Elmi. The trial court then conducted the ER 404(b) analysis:

> The purpose for which the evidence is sought is to show that this is the way that—I mean, this is, again, the Dr. Brecht way of sedating people, of performing these kinds of surgeries. So it goes to her preparation. It goes to her plan. It goes to any kind of lack of mistake that she just didn't really understand. Oh, wait, I—for this one time, I had to do this. You know, this is the way she does it all the time.
>
> So I think it serves that purpose and it's certainly—is relevant to prove an element here at issue, the standard of care and whether or not she—her conduct was below the standard of care. And the probative value is very high. It's not unfairly prejudicial. Again, these are Dr. Brecht's own admissions. So I think it satisfies that test . . . for admissibility.

Elmi also sought to introduce RCW 18.130.180(4)—part of the statutory definition of unprofessional conduct for health care professionals—for illustrative purposes to help

the jury understand exhibit 261.[1]  Dr. Brecht objected on the grounds that it would

confuse the jury.  The trial court ruled that reference to the statute would be redacted

unless Dr. Brecht provided a limiting instruction.  The parties agreed on a limiting

instruction and RCW 18.130.180(4) was introduced for illustrative purposes only.  The

trial court gave the following instruction:

> Evidence on the subject of the content of the language of the statute referenced in Exhibit 261 will now be introduced.  You may consider this evidence only to determine what Defendant Dr. Brecht agreed to in this order and to understand her testimony in this case regarding the agreed order.  You are not to consider this evidence for any other purpose.  You are not to discuss this evidence when you deliberate in the jury room to determine the standard of care in this case.

> Also related to exhibit 261, Elmi introduced the CR 30(b)(6) deposition of

Karinen.  Before the deposition was played, the trial court gave the following instruction

to the jury:

> Members of the jury, in this deposition, evidence on the subject of the content of statute RCW 181.30.180 subsection (4) will be presented.  You may consider this evidence only to determine the content of Dr. Brecht's agreed order with the Washington Medical Commission . . . and to understand this witness's testimony in this case regarding the agreed order.  You are not to consider this evidence for any other purpose.  You are not to discuss this evidence when you deliberate in the jury room to determine the standard of care in this case.

> Karinen testified that the WMC oversees the professional conduct of doctors and

has the authority to take enforcement action if doctors violate the Uniform Disciplinary

Act, ch. 18.130 RCW.  He testified that the WMC identified deficiencies in Dr. Brecht's

---

[1] RCW 18.130.180(4) provides that the following constitutes unprofessional conduct:
Incompetence, negligence, or malpractice which results in injury to a patient or which creates an unreasonable risk that a patient may be harmed.  The use of a nontraditional treatment by itself shall not constitute unprofessional conduct, provided that it does not result in injury to a patient or create an unreasonable risk that a patient may be harmed.

treatment records and documentation of care and had overall concerns about her clinical judgment particularly when screening patients. He described the statute referred to in the order, RCW 18.130.180(4), as the "standard of care subsection" and that it "involves the allegation of negligence and/or risk of harm to a patient by the conduct that's being described."

The trial court also allowed testimony of Kodis-Fisher about her experience with Dr. Brecht, finding that it was relevant and admissible:

> since it's not a prior bad act, I don't think 404 (b) necessarily applies. But even if 404(b) does, I think that it is admissible for purposes such as showing the preparation that Dr. Brecht does for performing any surgeries. This is how—this is her way of—of preparing with patients for what the procedure's going to be.
>
> . . . .
>
> The limited parameters of the testimony that will be elicited from this witness, which I think is relevant, and I think it passes the 403 test. It's not unfairly prejudicial. It's probative, the kind of preparation for procedures that Dr. Brecht goes through with her patients. And this is someone that, you know, had that procedure right around the same time as Ms. Elmi, and so I'm going to allow it.

Kodis-Fisher testified that the consent forms were hard to read and blurry and that no one went through the documents with her. She testified that Dr. Brecht did not go over the risks of surgery and that she described the surgery as routine with a simple incision that would leave minimal scarring. She described the medications she was instructed to take and that she had no memory of what happened after she arrived at the office. Kodis-Fisher testified that she was not clear on exactly what her surgery entailed or what was going to happen afterward.

B

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." ER 401. Relevant evidence is admissible except as limited by constitutional requirements or as provided by statute, rule, or regulation. ER 402. "The threshold to admit relevant evidence is very low. Even minimally relevant evidence is admissible." State v. Darden, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002). ER 404(b) bars evidence of other "crimes, wrongs, or acts" to prove the character of a person to show action in conformity therewith, but allows admission of such evidence for other purposes. Other purposes include, but are not limited to "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b).

"An evidentiary error which is not of constitutional magnitude, such as erroneous admission of ER 404(b) evidence, requires reversal only if the error, within reasonable probability, materially affected the outcome." State v. Everybodytalksabout, 145 Wn.2d 456, 468-69, 39 P.3d 294 (2002) (quoting State v. Stenson, 132 Wn.2d 668, 709, 940 P.2d 1239 (1997)). "The error is 'not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.'" Everybodytalksabout, 145 Wn.2d at 469 (quoting State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997)). "The error is harmless if the evidence is of minor significance compared to the overall evidence as a whole." Everybodytalksabout, 145 Wn.2d at 469.

Here, even if we agree with Dr. Brecht that admission of exhibit 261, the statute, Karenin's testimony, and Kodis-Fisher's testimony was improper under ER 404(b), the error was harmless considering the evidence as a whole.

The jury heard evidence that Dr. Brecht breached the standard of care in several instances including approving Elmi for surgery without knowing her A1C levels. Dr. Brecht testified that she did not document Elmi's A1C during screening. Dr. Brecht testified that she did not test Elmi's A1C because Elmi told her it was 7.4; but in deposition testimony Dr. Brecht said Elmi's A1C was 10. Dr. Brandford testified that normal A1C is in the range of "high five to six" and clearing a patient for anesthesia and surgery without knowing the patient's A1C is a breach of the standard of care. Dr. Mangubat testified that before surgery he determines whether a patient's A1C tends to be high. Dr. Rubenstein testified that based on Elmi's health and risk factors, she should not have been considered for surgery and Dr. Brecht lacked sufficient information to make the decision to proceed with surgery.

The jury heard evidence that Dr. Brecht breached the standard of care by performing too many surgeries at once and closing incisions with too much tension. Dr. Rubenstein testified that it was an error in judgment to perform multiple surgeries at once considering Elmi was a poor candidate and particularly in combination with the large volume liposuction and abdominoplasty. From his observations of Elmi's incisions, Dr. Rubenstein described the excessive tension and resulting necrosis caused by Dr. Brecht's failure of technique and a cursory presurgery marking of where to cut. Dr. Luu also testified that doing multiple surgeries at once, particularly liposuction and a tummy tuck, increases the risk of necrosis.

Dr. Rubenstein testified that Dr. Brecht violated the standard of care by failing to perform muscle plication for the tummy tuck and failing to achieve symmetry on the breast lift.

Dr. Rubenstein testified that Dr. Brecht violated the standard of care postsurgery by using tape repeatedly even when it was causing more trauma and failing to offer medication to help with scarring. Dr. Rubenstein testified that Dr. Brecht violated the standard of care by waiting 10 days after noting an odor coming from the arm wound to test for infection.

The jury heard evidence that Dr. Brecht failed to disclose material risks and violated the principles of informed consent. Dr. Brecht testified that the risks and benefits of treatment specific to Elmi were included on a "front page" that was referenced throughout the forms, or were conveyed to Elmi verbally. Dr. Brecht also testified that the "front page" was only to "go over that this is office space procedure under local anesthesia, and listing the surgeries."

Dr. Rubenstein testified that the "front page" was not a consent form and that the absence of Dr. Brecht's signature indicates "if it's not documented, it didn't happen." Dr. Rubenstein testified that Dr. Brecht's documentation and consent forms inadequately described and disclosed the data and risks particular to Elmi for smoking, diabetes and scarring, high body mass index, and high volume liposuction. Dr. Rubenstein testified that the consent forms provided to Elmi were not curated to her as shown by the irrelevant or missing information on specific procedures.

Elmi testified that when she went to ARS for surgery she was given a "cocktail" of medication and then she was asked to sign forms. Medical assistant Lopez testified

that part of her job was to give patients the consent forms and that even though she signed Elmi's forms as a witness, Lopez did not actually witness Elmi sign them.

Based on the foregoing, the challenged evidence is of minor significance considering the evidence as a whole. There is no reasonable probability that exhibit 261, the statutory language, the testimony of Karinen, and the testimony of Kodis-Fisher materially affected the outcome of the trial. Thus, any error in admitting the evidence under ER 404(b) was harmless.[2]

III

Dr. Brecht argues the trial court erred by denying the motion for mistrial because of the admission of Dr. Brandford's irrelevant testimony regarding anesthesia. Dr. Brecht briefly asserts that the testimony was irrelevant to the informed consent claim. We disagree.

We review a trial court's decision to deny a mistrial for abuse of discretion. Helmbreck v. McPhee, 15 Wn. App. 2d 41, 67, 476 P.3d 589 (2020). "The trial court should grant a mistrial 'only when nothing the court can say or do would remedy the harm caused by the irregularity or, in other words, when the harmed party has been so prejudiced that only a new trial can remedy the error.'" Helmbreck, 15 Wn. App. 2d at 67-68 (quoting Kimball v. Otis Elevator Co., 89 Wn. App. 169, 178, 947 P.2d 1275

---

[2] Dr. Brecht also argues the trial court abused its discretion by admitting exhibit 260 under ER 404(b). Dr. Brecht moved to exclude all "DOH/WMC evidence" under ER 404(b). When objecting to exhibit 260 specifically, Dr. Brecht did not argue exclusion based on ER 404(b). Instead, Dr. Brecht objected to the evidence as irrelevant and cumulative. "Even if an objection is made at trial, a party may only assign error in the appellate court on the specific ground of the evidentiary objection made at trial." DeHaven v. Gant, 42 Wn. App. 666, 669, 713 P.2d 149 (1986). Accordingly, we do not address whether the trial court abused its discretion by admitting exhibit 260 under 404(b). RAP 2.5(a); Roberson v. Perez, 156 Wn.2d 33, 39, 123 P.3d 844 (2005).

(1997)). In determining the effect of an irregularity, this court examines (1) its seriousness, (2) whether it involved cumulative evidence, and (3) whether the trial court properly instructed the jury to disregard it. Helmbreck, 15 Wn. App. 2d at 68 (citing State v. Emery, 174 Wn.2d 741, 765, 278 P.3d 653 (2012)). A trial court has broad discretion to rule on irregularities during trial because it is in the best position to determine whether a trial irregularity caused prejudice. State v. Wade, 186 Wn. App. 749, 773, 346 P.3d 838 (2015).

Following cross-examination of Dr. Brandford, Elmi conceded there was no injury incurred as a result of the sedation and so his testimony on standard of care regarding anesthesia was irrelevant. But Elmi asserted Dr. Brandford's testimony was relevant to the standard of care for screening and informed consent. The parties agreed to an instruction and the trial court instructed the jury as follows, "you have heard testimony from Dr. Brandford regarding violations of the standard of care. You are to disregard any testimony from Dr. Brandford as it relates to standard of care and/or proximate cause related to Dr. Brecht's sedation practices or methods or anesthesia."

Dr. Brecht argues that the entirety of Dr. Brandford's testimony was irrelevant to both the medical negligence and the informed consent claims. Dr. Brecht also points to the jury question about anesthesia and the standard of care after receiving the limiting instruction. But this question came after the jury heard from Dr. Brecht's expert witness, Dr. Mandell-Brown who also testified about the standard of care and anesthesia. The trial court provided the following jury instruction:

> You have heard testimony regarding violations of the standard of care. You are to disregard any testimony as it relates to standard of care and/or proximate cause related to Dr. Brecht's sedation practices or methods of

-15-

anesthesia. You may consider this testimony with regard to plaintiffs' informed consent claim.

Dr. Brecht provides no argument that Dr. Brandford's testimony was a serious irregularity. Nor does she address other properly admitted evidence on breach of standard of care or lack of informed consent. And the jury was twice instructed to disregard standard of care testimony related to sedation and anesthesia. The jury is presumed to follow the court's instructions. Singh v. Edwards Lifesciences Corp., 151 Wn. App. 137, 152, 210 P.3d 337 (2009).

Dr. Brecht briefly raises the issue of proximate cause and injury required to prove informed consent. She relies on Backlund v. University of Washington, 137 Wn.2d 651, 668, 975 P.2d 950 (1999), to support her argument that the testimony was irrelevant because the undisclosed risk must be both material and "the kind of risk or danger which resulted in harm," and Elmi conceded there was no harm caused by anesthesia. But her argument misses the mark and quotes from Backlund out of context. In Backlund, the court discusses the third element of an informed consent claim which requires the fact finder to determine "whether a reasonably prudent patient in the plaintiff's situation would have chosen a different treatment option." Backlund, 137 Wn.2d at 667-68. In support of this statement of law the Backlund court cited to several cases including Canterbury v. Spence, 464 F.2d 772, 791 (D.C. Cir. 1972), in which the court said "[i]f adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk or danger that resulted in harm, causation is shown."

Dr. Brecht asserts that Elmi must show the undisclosed risk caused harm. But the fourth element of an informed consent claim requires that Elmi show the treatment at issue proximately caused injury to the patient. Backlund, 137 Wn.2d at 664. Elmi's argument was that had she been adequately informed of the risks relating to the surgeries as performed by Dr. Brecht she would not have consented to the surgery and it was the surgery that caused her injury. And Dr. Brandford's testimony was certainly relevant to the material risks and informed consent relating to surgery such as screening for surgery, diabetes, and anesthesia.[3]

Dr. Brecht fails to establish that because of the admission of Dr. Brandford's testimony she suffered prejudice so great that it could only be addressed by a new trial. Thus, the trial court did not abuse its discretion by denying the motion for mistrial.

IV

Dr. Brecht argues the trial court erred by denying the motion for new trial because Elmi committed misconduct throughout trial creating incurable prejudice. Dr. Brecht asserts a new trial was required because of the violations of the motions in limine regarding exhibit 261 and testimony of Kodis-Fisher.[4] We disagree.

We review a trial court's decision to deny a new trial for abuse of discretion. Brundridge v. Fluor Fed. Servs., Inc., 164 Wn.2d 432, 454, 191 P.3d 879 (2008).

---

[3] Dr. Brandford testified that diabetes presents complicated and important risks for a surgical patient that should be disclosed prior to surgery and that a patient's A1C must be known prior to surgery. Dr. Brandford also identified lack of intravenous access as a risk. He testified that the forms appeared incomplete as to patient history and confusing as to the risks of anesthesia.

[4] Dr. Brecht also argues that a new trial was required because of the violation of Elmi's motion in limine by asking Dr. Luu about "Cinderella Anesthesia," and Elmi's misrepresentation of the scope of claims regarding anesthesia and harm and subsequent withdrawal of that claim for medical negligence. But Dr. Brecht did not argue misconduct related to Dr. Luu's testimony or the scope of anesthesia claims in her motion for new trial under CR 59(a)(2). Accordingly, we decline to address the argument on appeal. RAP 2.5(a); Roberson, 156 Wn.2d at 39.

A

In motions in limine, exhibit 261 was redacted to show four surgical patients only. Dr. Brecht testified that she agreed to everything in exhibit 261, and that "I think it's referring to four patients, not Ms. Elmi." The testimony led to the following exchange:

Q:  Is it only having to do with four patients?
A:  That's what the agreed order is talking about.
Q:  Dr. Brecht, there are more patients in this order than four, isn't there?
A:  I agreed to whatever was in this order.
MS. WICK:  Objection, Your Honor . . . Motions in limine.
THE COURT:  Well, I'm going to let her answer stand.  Go ahead.
MS. ALIMENT:  Did you say sustained?
THE COURT:  I'm going to let her answer stand, so that's essentially being overruled.  She answered before—
MS. ALIMENT:  I couldn't hear her answer over Counsel's objection.  Sorry.
THE COURT:  Her answer, Dr. Brecht's answer is going to stand.  Just ask your next question.
Q.  (By Ms. Aliment): How many patients were addressed in this order?
A:  I don't—well, A, B, C, D.  We're talking about four patients.
Q:  Dr. Brecht, there's nine patients addressed in this order, isn't there?
MS. WICK:  Objection, Your Honor.  Motions in limine.

Outside the presence of the jury, Dr. Brecht asked for mistrial and the trial court disagreed that mistrial was the appropriate remedy.  Instead the trial court instructed the jury as follows:

Exhibit 261 covers four patients and four patients only: Patients A, B, C, and D.  You are to disregard any testimony that's inconsistent with that.  And I want to remind you that questions or statements of Counsel is not evidence.  The evidence is the testimony of the witnesses and the exhibits that are admitted.  That is the testimony—or that is the evidence.  So to the extent that there was any questions that suggested that additional patients were covered by this exhibit, you are to ignore the content of that question.

Also in motions in limine, the testimony of Kodis-Fisher was limited to oral statements by Dr. Brecht while going through consent forms. Elmi's counsel asked Kodis-Fisher about her scars:

> Q: Are the scars that you have today consistent with how they were described to you before surgery by Dr. Brecht?
>
> MS. MARQUEZ: Objection, Your Honor. Motions in limine.

Outside the presence of the jury, Dr. Brecht renewed her motion for mistrial and the trial court made the following ruling:

> An unanswered question, in my view, is—is not worthy of a mistrial. And the question itself did not contain sufficiently prejudicial information or anything else that would warrant that severe of a recourse.
> I do think that counsel needs to be mindful of the Court's rulings on motion in limine and just not push it. I feel like you're kind of just trying to tiptoe right up to the line and sometimes peek over, and you just don't need to do that. It's—it's not productive, and it's so—but I'm happy to instruct the jurors to disregard the prior answer and we can—I'm sorry—the prior question and we can move on. Or you don't need to make a bigger deal of it. That's your—that's your strategy and however you want to do it. But I'm offering you the opportunity for any kind of curative instruction that you want.
>             . . . .
> And, again, there's no actual evidence of nine patients. There's no actual evidence of the scarring, in regards to this witness. There's just the questions that touched on those topics, which I've reminded the jurors, and I'm happy to do it again, if you want me to, which is not the—the questions themselves are not evidence at all.

The trial court reminded the jurors that statements and questions of counsel are not evidence.

At the hearing on the motion for a new trial, Dr. Brecht did not argue misconduct by violations of motions in limine and relied on her motion. The trial court denied the motion:

I have considered the motion. I've considered the opposition. At just a fundamental level, there isn't anything in the record to support any of the arguments that are made based on what allegedly happened during the trial or what questions were asked, what answers were given, what ruling was made by the Court.

So as—as just that fundamental basis, I think that warrants denial of—of the motion. And that even—even essentially considering the arguments as being based on what happened and just making that assumption, I don't believe that the threshold has been met for a new trial.

B

Our Supreme Court has explained when new trials should be granted based on misconduct:

New trials premised on misconduct are appropriate when "misconduct of [the] prevailing party" "materially affect[s] the substantial rights of [the aggrieved] parties." CR 59(a)(2). A party seeking a new trial for misconduct must establish that (1) the challenged conduct was actually misconduct, (2) the misconduct was prejudicial, (3) the misconduct was objected to at trial, and (4) the misconduct was not cured by the trial court's instructions. The key question is whether "such a feeling of prejudice [has] been engendered or located in the minds of the jury as to prevent a litigant from having a fair trial."

Coogan v. Borg-Warner Morse Tec Inc., 197 Wn.2d 790, 806, 490 P.3d 200 (2021) (alterations in original) (citations and internal quotation marks omitted) (quoting Alum. Co. of Am. v. Aetna Cas. & Sur. Co., 140 Wn.2d 517, 537, 998 P.2d 856 (2000)).

In her motion for new trial, Dr. Brecht raised the violations of motions in limine but failed to make any argument and merely referred to the argument presented in her motion for mistrial—a motion that was denied.[5] And the motion for mistrial simply

---

[5] On appeal, Dr. Brecht does not raise the misconduct argument in her challenge to the denial of the motion for mistrial.

concludes, without citation to authority, that these two incidents amount to misconduct and satisfy the CR 59(a) standard.

In briefing to this court, Dr. Brecht cites to Teter v. Deck, 174 Wn.2d 207, 274 P.3d 336 (2012), and argues the two incidents amount to misconduct. But Teter is distinguishable because it involved violations of several orders and repeated attempts to improperly put exhibits in front of the jury over objection and in violation of motions in limine even after counsel was warned. 174 Wn.2d at 223-25. The level of misconduct here, if it even was misconduct, does not rise to the level shown in Teter. And Dr. Brecht fails to persuade that the two violations were not cured by the limiting instructions or that "such a feeling of prejudice [has] been engendered or located in the minds of the jury as to prevent a litigant from having a fair trial." Coogan, 197 Wn.2d at 806.

For these reasons, the trial court did not abuse its discretion by denying the motion for new trial.

V

Dr. Brecht argues the trial court erred by denying her motion for judgment as a matter of law and motion for directed verdict because Elmi's CPA claim is based on the results of the surgery and are indistinguishable from the medical negligence claim. Dr. Brecht relies on Ambach v. French, 167 Wn.2d 167, 173, 216 P.3d 405 (2009), and argues that Elmi did not provide evidence that Dr. Brecht's marketing induced patients to purchase her services.

A motion for directed verdict or judgment as a matter of law "should be granted only when, after viewing the evidence in the light most favorable to the nonmoving

party, there is no substantial evidence or reasonable inferences therefrom to support a verdict for the nonmoving party."[6] Mancini v. City of Tacoma, 196 Wn.2d 864, 877, 479 P.3d 656 (2021) (quoting H.B.H. v. State, 192 Wn.2d 154, 162, 429 P.3d 484 (2018)). "'Substantial evidence is said to exist if it is sufficient to persuade a fair-minded, rational person of the truth of the declared premise.'" Mancini, 196 Wn.2d at 877 (quoting Guijosa v. Wal-Mart Stores, Inc., 144 Wn.2d 907, 915, 32 P.3d 250 (2001)). "The evidence must be considered in the light most favorable to the nonmoving party." Mancini, 196 Wn.2d at 877 (quoting Bender v. City of Seattle, 99 Wn.2d 582, 587, 664 P.2d 492 (1983)).

RCW 19.86.090 allows "[a]ny person who is injured in his or her business or property" to bring a civil action to recover actual damages, trial costs, and attorney fees. Personal injuries do not constitute injury to business or property. Ambach, 167 Wn.2d at 173. "To state a prima facie claim under the [CPA], a plaintiff must establish five distinct elements: (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) public interest impact, (4) injury to the plaintiff in his or her business or property, and (5) causation." Williams v. Lifestyle Lift Holdings, Inc., 175 Wn. App. 62, 70, 302 P.3d 523 (2013) (citing Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 780, 719 P.2d 531 (1986)).

In Ambach, Dr. French performed a shoulder surgery on Ambach. Following the surgery, Ambach complained of excessive pain and it was determined she had a staph infection in her shoulder and needed further surgeries resulting in various financial

---

[6] "Motions for directed verdict and motions for judgment notwithstanding the verdict were renamed "motions for judgment as a matter of law" effective September 17, 1993." Guijosa v. Wal-Mart Stores, Inc., 144 Wn.2d 907, 915, 32 P.3d 250 (2001).

losses. But Ambach agreed that her CPA injury stemmed from the surgery itself and our Supreme Court held that "what she really seeks is redress for her personal injuries, not injury to her business or property." Ambach, 167 Wn.2d at 178-79. The court also noted that Ambach failed to "allege that Dr. French actively solicited her as a patient or advertised shoulder surgeries to the general public." Ambach, 167 Wn.2d at 178.

In Williams, Williams saw a television commercial for a "Lifestyle Lift" and she called the 1-800 number and received a brochure which made several claims about the "exclusively designed" and "minor" facelift that required no "dangerous general anesthetic" and produced immediate results and required minimal recovery time. 175 Wn. App. at 65. Williams was directed to a surgical center and had a consultation where she was shown a video that reiterated the sales pitch from the commercial and the same day she signed a surgery agreement. Williams, 175 Wn. App. at 69. The marketing strategy appealed specifically to patients wary of traditional facelift surgery. Following surgery, Williams suffered intense pain and swelling and eventually underwent a second surgery to correct the problems but ended up with deformed earlobes and numbness in one cheek. Williams sued under the CPA but her claim was dismissed on summary judgment. On appeal, this court distinguished Ambach, and noted that the essence of Williams's claim was that the defendants were in the business of selling surgeries and that she would have never given them money but for their advertising and marketing. Williams, 175 Wn. App. at 72. This court concluded that Williams stated a prima facie claim under the CPA. Williams, 175 Wn. App. at 74.

Here, Elmi's CPA claim is similar to the claim in Williams, that but for Dr. Brecht's deceptive advertising, she would not have given Dr. Brecht money. Dr. Brecht testified

-23-

that she was the ultimate decisionmaker for the marketing and advertisement of ARS services.   The jury saw evidence of the ARS process which involved internal and external marketing to accomplish the "ultimate goal" of getting patients to have surgery.  The plan involved scheduling "motivated" patients for a preop on the same day as the consult and obtaining a $1000 deposit.  Regarding public advertising, Dr. Brecht testified that she never renamed the ARS Yelp page.  Lopez testified that there were "a lot" of negative patient reviews on Yelp and that Dr. Brecht asked her to contact Yelp to inquire whether they could be taken down.  She testified that Yelp could not alter the negative reviews and that Dr. Brecht changed the name of her Yelp page to Restylyne.[7]

Elmi testified that she found Dr. Brecht online but did not see a lot of reviews of surgeries.  She testified that she looked at the ARS website.  The ARS website advertised Dr. Brecht's trademark "Cinderella Anesthesia."  The website also included photos of results for procedures done on stomachs and arms that showed small incisions.  The ARS website advertised Dr. Brecht as a "board certified physician from the University of Massachusetts, and completed her plastic surgery fellowship from University of South Florida."  Dr. Rubenstein testified that based on that information he would not know what her board certification was in.

Unlike in <u>Ambach</u>, here there was a marketing plan that targeted patients who were motivated to have surgery.  Although the advertising in this case did not occur exactly like the advertising in <u>Williams</u>, Elmi presented sufficient evidence to persuade a rational fair-minded person that Dr. Brecht used deceptive public advertising in her

---

[7] Also referred to in the record as "Restylane."

business.  The evidence is also sufficient to persuade that such practices caused Elmi to agree to the procedure and hand over her money.

Viewing the evidence in the light most favorable to Elmi, we conclude substantial evidence supports the verdict and the trial court did not err by denying the motions for judgment as a matter of law and directed verdict on the CPA claim.

We affirm.

_____
Mann, J.

WE CONCUR:

_____
Birk, J.

_____
, ACJ